

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-9-1998

# Senathirajah v. INS

Precedential or Non-Precedential:

Docket 97-3607

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation
"Senathirajah v. INS" (1998). *1998 Decisions.* Paper 241.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/241

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed October 9, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 97-3607

CHENTHILKUMARAN SENATHIRAJAH,
       Petitioner

v.

IMMIGRATION & NATURALIZATION SERVICE,
       Respondent

On Petition for Review of an Order of the
Board of Immigration Appeals
From Immigration & Naturalization Service
(No. 0313-2: A73 488 828)

Argued: May 19, 1988

Before: ROTH and McKEE, Circuit Judges and
O'NEILL, Senior District Judge*

(Filed October 9, 1998)

        Chin W. Fong, Esq. (Argued)
        Suite 505
        7 Penn Plaza
        New York, New York 10001

Attorney for Petitioner

_____

*The Honorable Thomas N. O'Neill, Jr., Senior District Judge of the
United States District Court for the Eastern District of Pennsylvania,
sitting by designation.

Joan E. Smiley, Esq.
Karen F. Torstenson, Esq. (Argued)
Civil Division, Department of Justice
Michael P. Lindemann, Esq.
Vernon B. Miles, Esq.
United States Department of Justice
Office of Immigration Litigation
Ben Franklin Station
P.O. Box 878
Washington, D.C. 20044

Attorneys for Respondent

OPINION OF THE COURT

McKEE, Circuit Judge.

Chenthilkumaran Senathirajah appeals the decision of
the Board of Immigration Appeals ("BIA" or the "Board")
denying his petition for review of an immigration judge's
ruling denying his application for asylum and withholding
of deportation under 8 U.S.C. SS 1101(a)(42)(A), 1158(a) and
1253(h). For the reasons that follow we will grant the
petition and remand for further proceedings consistent with
this opinion.1

I.

Senathirajah is a fifty-one year old ethnic Tamil from Sri
Lanka who claims to have been tortured while detained by
the Indian Peace Keeping Forces ("IPKF "), the Sri Lankan
_____

1. We have jurisdiction to review the BIA's final order pursuant to 8
U.S.C. S 1105(a)(1), as amended by the Illegal Immigration Reform and
Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208,
110 Stat. 3009. The IIRIRA repeals relevant portions of S 1105 and
replaces them with a new judicial review section codified at 8 U.S.C.
S 1252, et seq. However, this amendment does not apply here, as the
order that Senathirajah appeals was entered before September 30, 1996.
See Chang v. INS, 119 F.3d 1055, 1059 n.1 (3d Cir. 1997). For
simplicity, we will refer to the Immigration and Nationality Act as it
existed prior to amendment.

2

military and the Sri Lankan police.[2] His claims include: (1) a two year period of detention and torture beginning with an arrest by the IPKF in March 1988 for suspected membership in the Liberation Tigers of Tamil Eelam ("LTTE" or "Tigers"); (2) detention and torture by the Sri Lankan army beginning with an arrest in July 1992 for suspected membership in the LTTE; and (3) detention and physical abuse by the Sri Lankan police beginning with an arrest in January 1994 for suspicion of membership in the LTTE.

Soon after the last detention alleged by Senathirajah, he hired "an agent" to procure a Canadian passport for him to travel outside of Sri Lanka. App. at 322. On February 2, 1995, Senathirajah arrived at Kennedy Airport in New York where he signed a sworn statement before an Immigration and Naturalization Service ("INS") inspector regarding his attempted entry into the United States (the "affidavit"). The affidavit, which is transcribed in hand-printed, question and answer format contains the following:

> Q: What is your level of education? Do you work?
>
> A: I graduated college, I am a teacher-I teach English.
>
> Q: Sir, have you answered all my questions truthfu lly?
>
> A: Yes.
>
> Q: Would it be a burden if you had to leave/return  to Sri Lanka at this time?
>
> A: My house was burned by the Sri Lankan army and I am coming for political asylum in Canada.
>
> . . . .
>
> Q: Sir, do you wish to add to this statement at th is time?
>
> A: No, only that I want political asylum in Canada.
>
> Q: Sir, at this time you appear excludable . . . Y ou can withdraw you[r] application to enter the U.S.

_____

2. In Balasubramanrim v. INS, 143 F.3d 157 (3d Cir. 1998), we discussed at some length recent Sri Lankan history; therefore, we decline to do so again here.

3

> voluntarily or you can ask for an exclusion hearing at
> a later date. Which do you choose?
>
> A: I want to go to Canada, I cannot go back.

App. at 227. The INS subsequently charged Senathirajah with excludability from the United States, under 8 U.S.C. SS 1182(a)(7)(A)(I)(I) and 1182(a)(6)(C)(I) for attempting to enter the United States by fraud and without a valid visa.3 App. at 357.

On May 1, 1995, Senathirajah submitted a formal application for asylum using INS Form I-589. That form contains the following:

> 1. Why are you seeking asylum?
>
> If I returned to Sri Lanka, I will be arrested, detained, tortured and be killed.
>
> 2. What do you think would happen to you if you returned to the country from which you are claiming persecution?
>
> Due to my Tamil nationality and the suspicion that I am a member of the LTTE and from Velvettithurai, if I were returned to Sri Lanka, I will be persecuted.

App. at 317. In a statement that Senathirajah attached to the application he stated:

> 1. I was born in Velvettithurai in the northern pr ovince of Sri Lanka on the 26th of December 1947. I completed my secondary education in 1968. After working full time for a while, I studied full time from 1974 to 1977 at a technical college and obtained a diploma in English.
>
> ***
>
> 4. Since 1983, the Sri Lankan government has been engaged in armed conflict with Tamil militants. In May 1987, the Sri Lankan armed forces launched a major offensive in Velvettithurai . . . . During this offensive, the Sri Lankan government engaged in indiscriminate bombing. During one of the Sri Lanka government's

_____

3. Senathirajah's attorney has conceded excludability. App. at 160.

4

bombing raids, the boat yard where I worked was damaged severely. As a result, I left the village with my family and moved to another village.

5. In August 1987, pursuant to the Indo-Sri Lankan Accord, the Indian Peace Keeping Force (IPKF) came to Sri Lanka to restore peace and normalcy. When the IPKF arrived, the Sri Lankan armed forces were confined to barracks. I returned to my village with my family.

6. In October 1987, war broke out between the IPKF and the LTTE. . . .

8. In March 1988, during a meeting of our communit y center, the members of the IPKF came to our center and arrested the Secretary and myself. We were taken to the IPKF camp.

9. At the camp, we were asked about the whereabout s of LTTE members. We denied any knowledge about the LTTE. The next day we were subjected to an identification parade. A man with a black mask was brought in. We were brought in front of the man with a black mask and the IPKF man asked the informant whether we were LTTE members. When certain persons were brought in front of the informant, he nodded his head. When it was my turn, the informant nodded his head. I was taken away, put in solitary confinement and subjected to torture.

10. I was detained by the IPKF until its departure. Following talks between the Sri Lankan government and the LTTE, the IPKF left Sri Lanka.

11. . . . . In June 1991, war broke out between th e Sri Lankan government and the LTTE.

12. . . . . In July 1992 . . . the Sri Lankan army captured our town. The LTTE cadres left my village when the Sri Lankan armed forces raided the area.

13. Around 10 p.m., the Sri Lankan military came t o my house. When they entered my house, they hit me with their guns and accused me of being a Tiger and arrested me. I was taken to their camp.

5

14. At the camp, I was accused of being a member o f the LTTE. They wanted to know the whereabouts of LTTE members. When I said I didn't know, they tortured me. I was detained and continually tortured till October 1993. . . .

17. In January 1994, the Sri Lankan armed forces raided my lodge [in Colombo]. When the Sri Lankan armed forces came to my room, they asked for my identification card. Upon seeing my card, they realized that I was from the northern province. They immediately accused me of being a Tiger and arrested me.

18. I was first taken to the police station wher e I was interrogated and tortured. . . .

20. Because I feared I would be arrested again, I decided to leave Sri Lanka.

App. at 321–22.

Senathirajah had an asylum hearing on August 10, 1995. During that hearing, he testified to enduring atrocities similar to those set forth in the above statement, with some additions. He testified that his house had been "demolished" by the Sri Lankan military, that from 1988 to 1990 he was detained by the IPKF, denied proper food and forced to wear the same clothing. App. at 191, 197–98. He also testified that he had been arrested by the Sri Lankan military in 1992 when the military came to his home and accused him of being a member of the LTTE. He stated that he was taken to a military camp where he underwent torture that included having both hands tied behind his back, being slapped, and being hit on the head with a bat. He said members of the military made him undress and drink his own urine whenever he asked for water. App. at 179–80. Senathirajah also testified about an arrest in January 1994 in Colombo where he had gone for medical treatment. App. at 180–183.

When asked about his fluency in English, as suggested by the averments in his affidavit, Senathirajah replied "yeah, some, little English." However, he added "pronunciations" of foreigners "is a little difficult." App. at

6

192. He then stated that he had requested a Tamil interpreter at the time of his airport interview, but was told that none was available. Therefore, he proceeded to give the statement without an interpreter.

Senathirajah testified at his hearing that he signed the affidavit because he was "scared." He stated that "[t]he officer told me to sign. The two people the agent brought were (indiscernible) to sign the document, so I thought if I sign also, I'll get released. With that intention I signed." App. at 193. Senathirajah then insisted that he had been unaware of the contents of the statement before he signed it. Id.

The immigration judge denied Senathirajah's application for asylum. We will quote her explanation for doing so at length because her reasoning is at the heart of our inquiry.

> I have observed the demeanor and testimony of the Applicant, and for the following reasons, I find that his testimony is not credible. 1) the Applicant has testified that he was arrested on three different occasions, the first time being for a period of two years, the second time for a period of approximately a year and three months, and on the third occasion for a period of a year. He stated that the date of the employment as regards his tutoring profession was indicated in the Form I-589 as that being from January 1978 until October 1993 because he had off and on been involved in this profession for those years. However, it should be noted the end date of the employment as a tutor as indicated on the Form I-589 (the asylum application), part E is that of October 1993. In fact, Applicant has stated that he was jailed from July 1992 until October 1993. 2) The Applicant has indicated both on direct examination and, although there was some confusion as to his testimony on cross examination, the Applicant had testified that he was in detention from March of 1988 to March of 1990 by the IPKF. However, it was only on redirect and upon specific questioning by the Court that the Applicant testified that in February of 1989, he was, in fact, for a period of one month released from the IPKF. He stated that it was by

7

agreement, not physical force,[4] that he then returned back to the IPKF, and that he was then detained up until March of 1990. There was absolutely no testimony on direct or cross examination as to this fact. 3) Although on direct examination the Applicant stated that he was first arrested in March of 1988, second arrested in July of 1992 and third arrested in January of 1994, on cross examination, the Applicant testified that the next time after his detention with the IPKF that he had problems in Sri Lanka was in January of 1994. It should also be noted that on direct examination, the Applicant testified that he knew "little English" and that he had requested that a Tamil interpreter be provided for the questioning by the inspector. While it may be true that the Applicant may have had some difficulty in understanding the "foreign" pronunciation, the response that he knew "little English" is in direct contradiction to his written application in the Form I-589 . . . where he indicates "I am fluent in English." Further, he testified that he has a degree in the English language, and that in fact he had worked as an English tutor for a period that covers over fifteen years. . . .

Immigration Judge Opn. at 10-12.

Then, in an explanation that is nothing short of astounding for reasons we detail below, the immigration judge further stated that even if she were to take Senathirajah's claims as true, she would still find him ineligible for relief because his suspected membership in the Tigers, a purported violent group, is valid reason for the government of Sri Lanka to investigate him. Id. at 13. The Judge stated "[i]nvestigations as to the criminal conduct of

_____

4. Senathirajah's actual testimony was that he was told that if he did not return within a specified time after making funeral arrangements, his captors told him they would "come and take me. I am the person who has to do the funeral rights. That's why the village people spoke with the officer, and the officer released me" subject to the threat of forceful recapture if he did not return. App. at 219. Thus, the immigration judge's characterization of Senathirajah's release and return as "by agreement" is a misleading account of what he actually said.

8

the Tigers is a valid Governmental investigation, and not persecution." Id. at 12.

The immigration judge was also influenced by Senathirajah's failure to corroborate his testimony other than by providing background materials on the conflict in Sri Lanka, and by what she characterized as a failure to provide detailed accounts of the abuse that he alleged. She noted that Senathirajah's affidavit did not include any discussion of the periods of detention that he testified to at his asylum hearing.

> Furthermore, the Applicant has not provided any corroboration in support of his testimony other than generalized background materials. It is also very troubling to this Court that the Applicant in relaying the three occasions that he was arrested and detained has not relayed in any detailed manner the alleged assaults and tortures. While he did mention that various acts took place, there was not a detailed account. It should also be noted that in the sworn statement taken at the airport the Applicant made absolutely no mention of the three periods of detention which allegedly was for a period of over four years. In fact, during today's hearing, the Applicant stated that he relayed to the inspector that he had come to the United States because his work place as well as his home was destroyed, but he did not testify that he had relayed any other information as to his detention to the inspector.

Id. at 13.

The immigration judge ruled that Senathirajah had failed to satisfy his burden as to both his asylum claim and as to his withholding of deportation claim. The judge also found that he had not met his burden of proof under the fraud component of S 212(a)(6)(C)(I), since she determined that Senathirajah had given a false name (Chenthilkumaran Senathirajah)5 to the INS inspector at Kennedy Airport, and he signed the affidavit using the assumed name. Accordingly, the judge ordered Senathirajah excluded and

_____

5. Petitioner's real name is Sittampalam Sundralingam.

deported from the United States pursuant to SS 212(a)(7)(A)(I)(I) and 212(A)(6)(C)(I) of the Immigration Act.

The BIA affirmed the immigration judge's decision. 6 The Board stated "[w]e do not ordinarily disturb an immigration judge's credibility finding, and give an immigration judge's credibility finding significant weight." BIA Opn. at 2 (citing Matter of V-T-S-, Interim Decision 3308 at 7 (BIA 1997); see Matter of Burbano, 20 I & N Dec. 872 (BIA 1994). However, although the BIA affirmed the immigration judge, it expressed concern over the judge's credibility determination as the BIA found that Senathirajah sufficiently explained some of the testimony that caused the judge to doubt his credibility. Nonetheless, the BIA concluded that the immigration judge "had substantial grounds for being unwilling to credit the applicant's account of the events that form the basis of his claim." Id. The Board was particularly troubled with Senathirajah's professed difficulty with English. The Board stated:

> [w]e agree with the immigration judge's assessment of the applicant's claim not to have understood the pronunciation of the English-speaking Service officer who examined him upon his attempted entry into the United States. In this regard we observe that the applicant testified that he studied English at the college level (citation omitted). We also observe that in his Application for Asylum and for Withholding of Deportation . . . the applicant indicates that he is fluent in English.

BIA Opn. at 2.

_____

6. On October 19, 1995, Petitioner filed a Motion to Withdraw Appeal, stating that the INS had agreed to parole him to Canada where he would be granted asylum and where he had relatives. App. at 104. On December 15, 1995, the BIA acknowledged by order that Senathirajah's appeal was withdrawn. App. at 103. On March 21, 1996, Petitioner filed a Motion to Reopen with the Immigration judge, stating that on December 26, 1995, the INS district director had "changed his policy of paroling individuals to Canada to seek asylum." App. at 91. On April 29, 1996, the Immigration judge denied the Motion to Reopen. App. at 84-85. The BIA then certified the case to allow consideration of the appeal. App. at 2-5.

The BIA also stated that, despite the lack of detail of the questions on the sworn statement, "the harm the applicant claimed to have suffered, also as reflected in the sworn statement, is not the kind of harm that the applicant's testimony indicates is the basis of his application for asylum." Id. The Board then affirmed the decision of the immigration judge as it found Senathirajah "not a credible claimant for asylum and withholding of deportation." BIA Opn. at 3. This appeal followed.

II.

A "refugee" is defined as

> any person who is outside any country of such person's nationality . . . and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

8 U.S.C. S 1101(a)(42)(A) (emphasis added). In the Refugee Act of 1980, Congress amended the Immigration and Nationalization Act to include section 208(a). That section gave the Attorney General discretion to grant asylum to those who qualify as refugees. It also amended section 243(h) so as to require that deportation be withheld if an alien "demonstrates a clear probability of harm on account of one of the enumerated factors." Chang v. INS, 119 F.3d 1055, 1061 (3d Cir. 1997).

> One of Congress's primary purposes in enacting the 1980 law was to harmonize United States law with the United Nations Protocol Relating to the Status of Refugees ("U.N. Protocol"), to which the United States became a party in 1968.

Id. (internal quotation marks omitted). The immigration Act thus requires the Attorney General to determine if an alien is a refugee. 8 U.S.C. S 1158 (1994). The alien has the burden of "show[ing] that he qualifies as a refugee . . . ." Balasubramanrim v. INS, 143 F.3d 157, 161 (3d Cir. 1998). To qualify as a refugee, an applicant must establish" by

11

objective evidence that it is more likely than not that he or she will be subject to persecution upon deportation." INS v. Cardoza-Fonseca, 480 U.S. 421, 430 (1987).

The Attorney General must withhold deportation if the applicant demonstrates that upon deportation his or her life or freedom would be threatened on account of one of the statutorily enumerated factors. 8 U.S.C. S 1253(h); Chang, 119 F.3d at 1066; see also Balasubramanrim, 143 F.3d at 164 n.10. To meet this test, the alien must demonstrate that there is a greater-than-fifty-percent chance of persecution upon his or her return. Vilorio-Lopez v. INS, 852 F.2d 1137, 1140 (9th Cir. 1987). If the alien fails to establish that his or her life or freedom will be threatened upon return so as to require that deportation be withheld, the Attorney General may still exercise her discretion and not deport the alien by a grant of asylum under S 208 of the Immigration Act. The latter requires that the alien establish a subjective fear of persecution that is supported by objective evidence that persecution is a reasonable possibility. Chang, at 1066.

It is obvious that one who escapes persecution in his or her own land will rarely be in a position to bring documentary evidence or other kinds of corroboration to support a subsequent claim for asylum. It is equally obvious that one who flees torture at home will rarely have the foresight or means to do so in a manner that will enhance the chance of prevailing in a subsequent court battle in a foreign land. Common sense establishes that it is escape and flight, not litigation and corroboration, that is foremost in the mind of an alien who comes to these shores fleeing detention, torture and persecution. Accordingly, corroboration is not required to establish credibility. The law allows one seeking refugee status to "prove his persecution claim with his own testimony if it is credible." Mosa v. Rogers, 89 F.3d 601, 604 (9th Cir. 1996) (citing Aguilera-Cota v. INS, 914 F.2d 1375, 1379 (9th Cir. 1990)). Here, Senathirajah claims that the BIA's "adverse credibility finding is not supported by the record [or] by law." Petitioner's Br. at 10. We agree.

12

III.

As noted above, the BIA's ruling results in substantial part from the deference it gave the immigration judge's decision. However, while affirming the immigration judge's conclusion as to Senathirajah's credibility, the BIA noted that it believed some of the immigration judge's skepticism was not warranted. Nevertheless, the Board affirmed the decision of the immigration judge even though the Board believed that "some of the aspects of the applicant's testimony with which the immigration judge had difficulty [were] adequately explained by the applicant." App. at 3.7 Nevertheless, the BIA appears to have substantially relied upon the adverse credibility ruling of the immigration judge in rejecting Senathirajah's petition. The BIA may defer to the credibility rulings of an immigration judge who actually heard the testimony, and observed the witnesses. However, the BIA is not required to do so, and it ought not to defer when such deference is not supported by its own independent review of the record.

> Where the immigration judge makes a credibility determination, the Board can independently assess that determination and make de novo findings on credibility. See Damaize-Job v. INS, 787 F.2d 1332, 1338 (9th Cir. 1986) ("The Board has the power to review the record de novo and make its own findings of fact.")

Balasubramanrim, at 161.

Here, although the Board did grant some deference to the immigration judge, it appears that the Board also conducted an independent examination of the record, and also concluded that Senathirajah was not credible. We must sustain the BIA's adverse credibility determination if there is substantial evidence in the record to support it. Chang, at 1060; see also Hartooni v. INS, 21 F.3d 336, 340 (9th Cir. 1994); Cordero-Trejo v. INS, 40 F.3d 482, 487 (1st Cir. 1994). "Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable

_____

7. In its brief opinion, the BIA did not state to what it was referring when
it made this statement.

13

mind might accept as adequate to support a conclusion." Turcios v. INS, 821 F.2d 1396, 1398 (9th Cir. 1987). An immigration judge who "rejects a witness's positive testimony because in his or her judgment it lacks credibility should offer a specific, cogent reason for [his or her] disbelief." Turcios, 821 F.2d at 1399 (citation and internal quotations omitted). We "evaluate those reasons to determine whether they are valid grounds upon which to base a finding that the applicant is not credible." Vilorio-Lopez v. INS, 852 F.2d 1137, 1142 (9th Cir. 1988) (citing Damaize-Job v. INS, 787 F.2d 1332, 1337-78 (9th Cir. 1986)).

The Board's credibility determination was based upon the following factors: (1) it disbelieved Senathirajah's testimony that he could not understand English as spoken by the INS inspector since Senathirajah testified that he had studied English at the college level and had stated on his asylum application that he was fluent in English; (2) Senathirajah did not "specifically claim that the Record of Sworn Statement . . . misrepresents his actual statement to the examining Service officer.";8 and (3) the harm that Senathirajah claimed that he suffered in his sworn statement or affidavit was not the same as that which he testified was the basis of his asylum application. BIA Opn. at 2.

The circumstances of Senathirajah's petition are quite similar to those that were before us in Balasubramanrim. There, the petitioner was also a Tamil from Sri Lanka seeking asylum and withholding of deportation. In ruling upon Balasubramanrim's petition for review, we noted the persecution facing residents of Sri Lanka who were identified as being Tamil, and the historical roots of that oppression. See Balasubramanrim, at 159. Balasubramanrim "claim[ed] to have been arrested, detained, and tortured on several occasions by the armed forces of the Sri Lankan government, the Indian peacekeeping forces and the Liberation Tigers." Balasubramanrim, at 159. Balasubramanrim also claimed

---

8. In fact, the BIA considered Petitioner's testimony as a confirmation of the accuracy of the sworn statement. BIA Opn. at 2.

14

that he would be subject to additional detention and torture if he returned to Sri Lanka because he was Tamil. On his application he stated that the following events occurred before he left Sri Lanka:

1. In March 1988, he was arrested by the Indian Peacekeeping Forces and taken to a camp where he was accused of being a Tiger and beaten;

2. In November 1989, he was again arrested . . . because he refused to join the ranks of one of the political fighting forces, was tortured for an entire day, and remained in custody for five days;

3. In March 1990, the Tigers arrested him for 10 d ays and accused him of being an informant for the Indian Peacekeeping Forces, a charge which he claims was untrue;

4. In 1991, his brother disappeared after being arrested by the Sri Lankan army;

5. In 1993, his father was killed by Sri Lankan air bombs;

6. In October 1993, he fled northern Sri Lanka but was arrested for failing to register in the new area;

7. Also in October 1993, after accusing Balasubramanrim of being a Tiger, the Sri Lankan army arrested, detained and tortured him for one year and ten days; eventually, his wife bribed the army for his release;

8. In late 1994, Sri Lankan armed forces arrested him at the airport as he was trying to leave the country with his family, and he was detained and tortured for four months and ten days.

Id. After the `94 arrest, Balasubramanrim left Sri Lanka using a fake Canadian passport, ultimately arriving at Kennedy Airport. There, INS officials interviewed him in English without the aid of a translator. The result of this encounter was a handwritten document with 25 questions and answers about Balasubramanrim's past and his reasons for seeking asylum.

15

Thereafter, Balasubramanrim appeared before an immigration judge where he told of the atrocities that he had endured. The immigration judge found him "excludable, denied his application for asylum and withholding of deportation, and ordered him deported to Sri Lanka." Id. at 160. The judge concluded that Balasubramanrim had not been truthful about his "prior arrests and his fears about returning to Sri Lanka. The [ ] judge also expressed doubts about his credibility because Balasubramanrim did not look at him while testifying and instead stared straight ahead `as though in a trance.' " Id.

The BIA affirmed the immigration judge's decision because of perceived inconsistencies between Balasubramanrim's testimony at the hearing and his airport statement.

However, we concluded that Balasubramanrim's airport interview did not necessarily accurately reflect the persecution that he suffered in Sri Lanka, nor the danger he would face if he were forced to return. We expressed concern that: (1) the handwritten record of the airport interview may not be reliable since "[w]e [did] not know how the interview was conducted or how the document was prepared"; (2) the airport statement was not an application for asylum; (3) an arriving alien may, because of past interrogation, be unwilling to disclose much information to government officials; and (4) the BIA may not have accurately assessed Balasubramanrim's English skills. Id. at 162–63.

We thus concluded that any discrepancy between Balasubramanrim's airport statement and his testimony was insufficient, by itself, to support the BIA's finding that the petitioner was not credible. Id. at 164 (citing Aguilera–Cota, 914 F.2d at 1382). We recognized that the BIA did not pursue Balasubramanrim's asylum and withholding of deportation claims because of its adverse credibility finding. However, " `[i]n the absence of substantial evidence supporting a finding of adverse credibility, the BIA is required explicitly to consider a petitioner's claims for asylum and withholding of deportation.' " Id. at 165 (quoting Mosa, 89 F.3d at 605).

16

We therefore granted Balasubramanrim's petition and remanded the case to the BIA with further instruction to remand to the immigration judge for a determination of Balasubramanrim's asylum and withholding of deportation claims "without reliance on the adverse credibility finding." Id. Specifically, we held that "because of ambiguities in the airport statement and the circumstances under which it was made, that statement does not provide sufficient evidence to support the adverse credibility determinations upon which the immigration judge and BIA denied the petition." Id.

Here, as in Balasubramanrim, the immigration judge and the BIA gave far too much weight to the affidavit taken during Senathirajah's airport interview. The government offered no testimony as to the circumstances under which that affidavit was obtained, or whether it was necessary to use sign language and/or gestures to communicate with Senathirajah. It is uncontested that he asked for an interpreter before he gave the affidavit and none was provided. As in Balasubramanrim, the affidavit here was not an application for asylum, and it should neither have been treated as such, nor read with the exacting eye that the BIA might use to examine statements that accompany Form I–589. By placing too much reliance on an airport interview under the circumstances here, and ignoring more detailed accounts in Form I–589 as well as testimony at an asylum hearing, the INS seriously undermined the reliability of the administrative process. Given Senathirajah's allegations of torture and detention, he may well have been reluctant to disclose the breadth of his suffering in Sri Lanka to a government official upon arriving in the United States even if he could understand the questions he was being asked at the airport.

The BIA affirmed the ruling of the immigration judge primarily because it agreed with the judge's conclusion that Senathirajah was fluent in English and could therefore be held to the statements in the affidavit and the apparent inconsistencies between those statements, the averments in Form I–589, and his later testimony at his asylum hearing. However, neither the BIA nor the immigration judge considered the limitations of the airport interview.

17

Moreover, Form I-589 allows for only two choices when inquiring about an applicant's facility with English. It asked only if Senathirajah was fluent, with no attempt to inquire into various degrees of proficiency one may have with a foreign language.9 Furthermore, neither the BIA nor the immigration judge appears to have given any consideration to the difficulty someone from Sri Lanka may have in understanding "American English," particularly under the stressful circumstances of entry into a new country. 10 During the asylum hearing, Senathirajah testified as follows:

> Q: Did you complete high school?
>
> A: Yes.
>
> Q: Did you complete college?
>
> A: I went to advanced level.
>
> Q: I'm sorry, to what?
>
> A: To advanced level, advanced level.
>
> Q: Of college?
>
> A: There they say college is still advanced level.  College is university. They say that university.
>
> Q: So you went to university?
>
> A: I went for community college.
>
> . . . .

_____

9. The asylum application asks that the applicant select one of two choices identifying his language facility. The application states:

> 17. Native Language: a. __ I am fluent  in English.
>                       b. __ I am not fluent in English, but I am fluent in Tamil.

10. Sri Lanka, which until 1972 was known as Ceylon, became an independent nation in 1948, after almost 150 years of British colonial rule. Consequently, the English taught to Sri Lankans is more than likely not of a vernacular commonly used in the United States. It seems no stretch, then, to assume that Petitioner might have needed an interpreter even if he technically "spoke the same language" as the INS inspector.

18

> Q: . . . . What was your major, what was your course
> of study?
>
> A: Diplomat and English.

App. at 195-96. Although it is not clear if Senathirajah meant to say that he had a "diploma" in English, or if he meant to say he studied "diplomacy" and English, it is clear that he had significant trouble in both speaking and understanding English during the asylum hearing. One cannot read the transcript from that hearing without realizing that there was significant difficulty communicating with Senathirajah even with the presence of a Tamil interpreter. For instance, though the immigration judge and BIA placed substantial reliance on Senathirajah's testimony that he had "tutored" English, throughout his testimony he continually used "tuition" for "tutor" thus illustrating far more significant difficulty with the language than either the immigration judge or the BIA realized. For example Senathirajah declared:

> Sometimes I go to houses and give tuition to
> students at their place. Sometime -- it's a private
> tutoring. That's why (indiscernible).
>
> ***
>
> It was often I was giving tuition when I was detained.
> Then afterwards when I come from detention then I
> went to tuition.
>
> ***
>
> In the application I put total (indiscernible), but I was
> given (indiscernible). Because the tuition work I was
> doing was not profit. Same time I was detained, and
> then I come back from detention, then I give tuition.

App. at 60, 63. Nevertheless, when asked "are you fluent in English?", Senathirajah responded: "Yeah, some, little English." Id. at 53. It is clear from the transcript that whatever Senathirajah thought "fluent" meant, his facility with English is less than one might expect from the use of that term. It is clear that his ability to speak and understand the language is not without difficulty.

19

Senathirajah argues that "advanced levels" in the British educational system in Sri Lanka translates into the first year of undergraduate studies in the United States. Letter from Chin Wei Fong, Attorney for Petitioner, 5/14/98, p.2. The government offered no evidence at the hearing to establish that Senathirajah's level of education would have allowed him more proficiency with English than he admitted to. It is undisputed that Senathirajah requested an interpreter when he arrived at the airport but that none was available. Although he signed the affidavit, we are unimpressed with the affidavit's reliability, or probative value. Senathirajah's testimony that he provided the interview after being kept at the airport for "three or four hours without water or food . . . I was feeling faintish," App. at 54, was not rebutted. Yet, the immigration judge and the BIA held Senathirajah to a level of proficiency in English that is inconsistent with his request for an interpreter, the circumstances under which the affidavit was taken, or with the transcript of the asylum hearing.

Moreover, we believe that it is irrelevant that Senathirajah does not assert that the affidavit misrepresents his actual statement at the airport. Senathirajah claims that the affidavit is incomplete because of ambiguous and incomplete questioning that did not effectively elicit information relevant to a subsequent claim for asylum and withholding of deportation. We agree. The following exchange is illustrative.

> Q: Would it be a burden if you had to leave/depart to Sri Lanka at this time?
>
> A: My house was burned by the Sri Lankan army and I am coming for political asylum in Canada.

App. at 227. The inspector's next question was:"Do you have any friends or relatives here in the U.S?" Id. Senathirajah argues that had the inspector asked a more precise question—perhaps a question about persecution rather then whether he had any relatives or friends—the inspector would have elicited a more complete account of the suffering that Senathirajah had suffered in the past and the likelihood of future suffering. In Balasubramanrim, we noted that the immigration judge also placed too much

20

reliance upon an airport interview where, after Balasubramanrim stated he would be killed if he returned home, "the next question was: `How did you get to the U.S. from Sri Lanka?' " Balasubramanrim, at 163.

The BIA affirmed the immigration judge's credibility finding partly on the ground that the harm that Senathirajah mentioned in the affidavit (his house being burned) was not the same as that mentioned during his testimony (arrests, detentions and physical abuse). However, there is nothing inconsistent in those two responses. At the airport, Senathirajah was asked if "it would be a burden" to return to Sri Lanka. He responded that his house had been burned down. Surely, having one's house burned down results in a burden. Senathirajah's statement that his house had been burned does not negate his subsequent testimony that he had been tortured during periods of detention. His statement regarding the burning of his home is responsive to the question he was asked. It is clearly a burden for one who is homeless to have to return home. At the hearing, neither the government nor the immigration judge asked Senathirajah why he did not tell the INS inspector about his detention or torture in Sri Lanka. It is unfair to fault him for not volunteering that information in response to the questions the INS inspector asked.

Similarly, the immigration judge discredited Senathirajah's testimony because he did not give a detailed account of what he had endured either during his airport interview or during his testimony. The judge stated:

> It is also very troubling to this Court that the Applicant in relaying the three occasions that he was arrested and detained has not relayed in any detailed manner the alleged assaults and tortures. While he did mention that various acts took place, there was not a detailed account. It should also be noted that in the sworn statement taken at the airport the Applicant made absolutely no mention of the three periods of detention which allegedly was for a period of over four years. In fact, during today's hearing, the Applicant stated that he relayed to the inspector that he had come to the United States because his work place as well as his

21

> home was destroyed, but he did not testify that he had relayed any other information as to his detention to the inspector.

Opn. at 13. Taking these concerns in turn we again note that Senathirajah answered those questions he was asked at the hearing. He told of being forced to drink his own urine when he asked for water, being kicked, and beaten on the head with a baseball bat. If the immigration judge wanted greater detail she should have asked appropriate follow up questions that may have elicited it. Thus, the immigration judge and the BIA ignore the most obvious reason for Senathirajah's purported failure to provide greater detail. He was not asked. When asked about the details of his detention, he told of beatings, and being forced to drink his own urine. We do not understand what further detail the immigration judge expected, and we surely can't fault Senathirajah for not knowing. Our review of the affidavit reveals no question that would have elicited any information about detention in Sri Lanka, let alone torture and persecution.

The immigration judge conceded that Senathirajah "may have had problems in understanding the oral language," Opn. at 12, when she discussed the answers he gave the INS inspector at the airport. Yet, she dismissed that possibility by concluding "he has signed a document. That is the Applicant had ample opportunity to review the question and answers that were written on [the affidavit]." Id. However, if Senathirajah did not understand the questions that were asked of him, it is irrelevant that he had time to review the response that the inspector attributed to him. In addition, as noted above, Senathirajah's testimony of the circumstances under which he gave the written statement remain uncontroverted. Finally, the immigration judge and BIA placed too much weight upon the fact that Senathirajah's written statement contained time frames that are not identical to those he testified to. "Minor inconsistencies in the record such as discrepancies in dates which reveal nothing about an asylum applicant's fear for his safety are not an adequate basis for an adverse credibility finding." Vilorio-Lopez, 852 F.2d at 1141. For example, the immigration judge was

22

troubled by Senathirajah's testimony that he was employed as a "tutor" during the time he was purportedly detained. Yet, his testimony was that he was self-employed and provided "tutoring" part time, and that he resumed tutoring upon his release. Thus, he may have well viewed himself as a tutor even though he was detained. He testified:"I was often I was giving tuition when I was detained. Then afterwards when I come from detention I went to tuition." App. at 199.

The asylum process ought to be a determination of whether someone is entitled to either a withholding of deportation, or a discretionary grant of asylum. It is a process that Congress has enacted, at least in part, to align the immigration laws of the United States with the law of nations. See Marincas v. Lewis, 92 F.3d 195, 198 (3d Cir. 1996) ("[T]he Refugee Act brought the domestic laws of the United States into conformity with its treaty obligations under the United Nations Protocol Relating to the Status of Refugees"). The procedures for requesting asylum and withholding of deportation are not a search for a justification to deport. Justice requires that an applicant for asylum or withholding of deportation be afforded a meaningful opportunity to establish his or her claim.

> Deportation is always a harsh measure; it is all the more replete with danger when the alien makes a claim that he or she will be subject to death or persecution if forced to return to his or her home country. In enacting the Refugee Act of 1980 Congress sought to give the United States sufficient flexibility to respond to situations involving political or religious dissidents and detainees throughout the world.

INS v. Cardoza-Fonseca, 480 U.S. 421, 449 (1987) (internal quotation marks omitted). We do not operate under any rule that prevents an asylum applicant from elaborating upon the circumstances underlying an asylum claim when given the opportunity to take the witness stand.

Before concluding our discussion of the merits of Senathirajah's petition for review, it is necessary for us to clarify a misconception expressed by the immigration judge. As noted above, the immigration judge concluded that she

23

would deny Senathirajah's application even if he were credible because "[i]nvestigations as to the criminal conduct of the Tigers is a valid Governmental investigation, and not persecution." Op. at 12. Although claims of torture, without more, do not afford Senathirajah the relief he seeks here, we emphasize that torture does not constitute valid governmental investigation, and conduct such as beatings with bats, and forcing one to drink one's own urine when thirsty ought not to be mistaken for legitimate governmental investigations by any judge.

> In light of the universal condemnation of torture in numerous international agreements, and the renunciation of torture as an instrument of official policy by virtually all of the nations of the world (in principle if not in practice), we find that an act of torture committed by a state official against one held in detention violates established norms of the international law of human rights, and hence the law of nations.

Filartiga v. Pena–Irala, 630 F.2d 876, 880 (2nd Cir,. 1980). See also Universal Declaration of Human Rights, General Assembly Resolution, 217 (III)(A)(Dec. 10, 1948) ("no one shall be subjected to torture"), American Convention on Human Rights, Art. 5, OAS Treaty Series No. 36 at 1, OAS Off. Rec. OEA/Ser 4 v/II 23, doc 21, rev.2. (English ed. 1975) ("No one shall be subjected to torture or to cruel, inhuman or degrading punishment or treatment"). The immigration judge's proclamation was apparently based upon her belief that the Tigers were a subversive organization and that "legitimate" forces in Sri Lanka therefore had a right to investigate. However, there is absolutely no evidence in this record that Senathirajah was a member of the Tigers, and even if he was, we disagree with the immigration judge's belief that the Sri Lankan government could use torture as part of its investigation into his activity.11 "Although torture was once a routine

_____

11. Our holding in Balasubramanrim establishes that the treatment of the Tamil in Sri Lanka, and the persecution that has resulted from the activities of the Tigers could be sufficient to support a claim for asylum or withholding of deportation. However, that decision was after Senathirajah's asylum hearing and the immigration judge here did not have the benefit of that discussion.

24

concomitant of criminal interrogations in many nations, during the modern and hopefully more enlightened era it has been universally renounced. According to one survey, torture is prohibited, expressly or implicitly, by the constitutions of over fifty-five nations. . . ." Pena-Irala, 630 F.2d at 884.

IV.

For the reasons set forth above, we conclude that the BIA did not have substantial evidence for its finding of adverse credibility. We therefore hold that the BIA erred in affirming the decision of the immigration judge. Thus, we will remand this case to the BIA with instructions that the matter be remanded to the immigration judge, for a ruling on Senathirajah's asylum and withholding of deportation claims without consideration of the prior adverse credibility findings.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

25