

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-3-2004

# Summesh Naul v. Atty Gen USA

Precedential or Non-Precedential: Non-Precedential

Docket No. 03-1762

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Summesh Naul v. Atty Gen USA" (2004). *2004 Decisions.* Paper 421.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/421

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

NO.  03-1762
_____


SUMESH NAUL,
Petitioner

v.

JOHN ASHCROFT,
ATTORNEY GENERAL OF THE UNITED STATES

_____

On Petition for Review of  an Order of the
United States Department of Justice
Board of Immigration Appeals
BIA No. A79-429-861

Argued May 27, 2004

Before:  RENDELL and COWEN, Circuit Judges,
and SCHWARZER*, District Judge.

(Filed: August 3, 2004)

Visuvanathan Rudrakumaran     [ARGUED]
Suite 2309
875 Avenue of the Americas
New York, NY   10001
    *Counsel for Petitioner*

* Honorable William W. Schwarzer, Senior District Judge for the Northern District
  of California, sitting by designation.

Mark C. Walters
Douglas E. Ginsburg
Lyle D. Jentzer
Stephen J. Flynn      [ARGUED]
U.S. Department of Justice
Office of Immigration Litigation
P. O. Box 878
Ben Franklin Station
Washington, DC   20044
    *Counsel for Respondent*

_____

OPINION OF THE COURT

_____

RENDELL, Circuit Judge.

Sumesh Naul, a citizen of Guyana, petitions for review of a decision by the Board of Immigration Appeals ("BIA") denying his application for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT").  In so ruling, the BIA affirmed without opinion the finding of the Immigration Judge ("IJ") that Naul lacked credibility because of inconsistencies between his testimony and certain documentary evidence presented.  We have jurisdiction under 8 U.S.C. § 1252.  For the reasons set forth below, we will grant Naul's petition for review.

I.

Naul was the sole witness at his asylum hearing, and he provided a narrative of his experiences from which we glean the following facts.  Naul is a 26 year-old citizen of

Guyana, and his ethnicity is Indo-Guyanese. Naul's father was a supporter of the People's Progressive Party ("PPP"), one of the two dominant political groups in Guyana. The PPP controls the national government, and the opposing party, the People's National Congress ("PNC"), controls the Guyanese police forces. The parties essentially correspond with the ethnic breakdown of the Guyanese people – the PPP is mostly Indo-Guyanese, and the PNC is mostly Afro-Guyanese. Naul was not an active PPP member, but after his father died, the PPP helped Naul set up his own automotive mechanic shop. In return, Naul did election campaign work in support of the PPP during the March 2001 election.

On March 4, 2001, as part of this campaign work, Naul and two other men were distributing posters in support of the PPP when they were confronted by a group of five Afro-Guyanese men who identified themselves as PNC members. The PNC members threatened them, and when Naul and the others protested, the PNC members beat them and threatened their lives. Upon returning home, Naul realized that he had cuts on his arm and forehead. He sought medical treatment for his injuries, and at the asylum hearing he submitted a doctor's report confirming his visit and describing his injuries. Naul reported the incident to the police, but no action was taken. Naul claims that he looked for an Indo-Guyanese police officer to speak with regarding the incident, but he could not find one.

In October of 2001, while Naul was walking to a supermarket near his home, a black van stopped next to him, and two men pulled him into the van. Once inside, the men reminded Naul of how they had beaten him before, and then proceeded to beat him again, this time threatening him with a gun as well. They warned him that if he did not close his auto shop, they would kill him. Naul indicated that the men were Afro-Guyanese mechanics who worked in the village where Naul's home and shop were located. The men also suggested that he disappear because they did not want to see him again in their village. Naul went to report the incident to the police, who slapped him and told him that they would put him in jail if he came to complain again. Naul's mother subsequently went to another police station in a nearby village to report the incident. However, she was advised that the police officers there could do nothing to help.

Fearing for his safety and the safety of his family, Naul closed his auto shop and moved to Mahadeo Munsamy's house to hide. Munsamy, who was a PPP member and, according to Naul, a member of Parliament, informed Naul that the government was weak and could not protect him because the police forces were controlled by the PNC. Munsamy also suggested that he "go to the next country and seek asylum." Following this advice, Naul contacted an agent who sold him a fake passport and a ticket to the United States.

Upon arriving in Miami in December of 2001, Naul was questioned and detained by INS authorities, who noticed his fake travel documents. After having a credible fear

4

interview with an INS officer, the agency referred Naul's asylum claim to an IJ for full consideration. Naul conceded removability before the IJ, renewed his request for asylum and withholding of removal, and sought protection under CAT. In addition to his testimony, Naul submitted six affidavits from family members and friends, along with the medical report related to his first assault and various articles describing the treatment of Indo-Guyanese by the PNC police forces.

In her oral decision, the IJ found that Naul was not credible and denied his asylum application. The IJ stated that there were material inconsistencies between Naul's testimony and the evidence presented. First, the IJ noted that the medical certificate documenting the treatment Naul received after the March 2001 incident did not indicate that Naul was treated for cuts, which he claimed were inflicted on him by the PNC members. Second, an affidavit submitted by a Justice of the Peace stated that Naul was beaten by protestors during the March 2001 incident, while Naul testified that his assailants were PNC members and did not mention a "protest." Third, Naul testified that his mother received threats that were conveyed to her by her neighbor, but his mother's affidavit mentioned that she had received the threats herself. Fourth, while Naul testified that Munsamy, the PPP member who advised him to leave Guyana, was a member of Parliament, Munsamy did not mention that he held such a position in his affidavit. And fifth, the IJ viewed Naul's testimony as being generally incredible, based on the extreme and "hysterical" nature of some of Naul's comments.

In the alternative, the IJ stated that Naul's beatings were not severe enough to constitute persecution, that he was not singled out because of his race or other protected grounds, and that the "persecution" could not be attributed to the government. The IJ also found that Naul had not shown he would be persecuted upon his return to Guyana. Finally, the IJ determined that there was no evidence in the record indicating that relocation was impossible or unreasonable. The BIA affirmed the IJ's decision without opinion.

On appeal, Naul challenges the IJ's conclusions regarding his credibility, the reasons for and severity of his past persecution, the reasonableness of his fear of future persecution, the existence of a pattern or practice of persecution of ethnic Indians in Guyana, and his ability to relocate within the country.

## II.

Where the BIA affirms without opinion, the IJ's decision becomes the final agency determination for purposes of our review. 8 C.F.R. § 1003.1(e)(4) (2003); <u>Dia v. Ashcroft</u>, 353 F.3d 228, 243 (3d Cir. 2003) (en banc). We exercise plenary review over the IJ's conclusions of law, although the agency's interpretation of the Immigration and Nationality Act ("INA"), and the regulations it has passed through the power granted to it under the INA, are "subject to established principles of deference." <u>Coraggioso v. Ashcroft</u>, 355 F.3d 730, 733 (3d Cir. 2004).

6

In reviewing factual findings contained in the IJ's decision, including adverse credibility determinations, we apply the substantial evidence standard, which allows us to grant the petition and vacate the IJ's determination only if the evidence is "so compelling that no reasonable factfinder could fail to find" in Naul's favor. INS v. Elias-Zacarias, 502 U.S. 478, 484 (1992). When we apply this standard of review, we consider whether "the evidence supporting [the IJ's] decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to [the IJ's] view." Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951).

As we review an IJ's determination that a petitioner lacks credibility, we examine whether the IJ provided specific reasons that "bear a legitimate nexus to the finding" that the petitioner's claims lack credibility. Balasubramanrim v. INS, 143 F.3d 157, 162 (3d Cir. 1998). We will generally defer to an IJ's credibility findings, so long as they are "conditioned on support in the record." Dia, 353 F.3d at 249-50 (quoting El Moraghy v. Ashcroft, 331 F.3d 195, 205 (1st Cir. 2003)). However, "minor inconsistencies in the record . . . are not an adequate basis for an adverse credibility finding." Senathirajah v. INS, 157 F.3d 210, 221 (3d Cir. 1998). The IJ must instead base such a finding on discrepancies that "involve the 'heart of the asylum claim.'" Gao v. Ashcroft, 299 F.3d 266, 272 (3d Cir. 2002).

7

We will first address the IJ's adverse credibility determination and explain why we must disagree with it. Unlike many immigration cases that come before us on review, the IJ here noted that Naul's testimony was entirely internally consistent, and was also completely consistent with his written asylum application. Because Naul did not contradict himself in his testimony or his application, the IJ relied upon perceived inconsistencies between Naul's account of his persecution and the documents presented in connection with his asylum claim. We conclude that the inconsistencies mentioned in the IJ's opinion, considered individually or in combination, do not go to the "heart" of Naul's asylum claim; therefore, they "are not an adequate basis for an adverse credibility finding." Senathirajah, 157 F.3d at 221.

The IJ first noted a discrepancy between Naul's testimony, which indicated that he had cuts on his right arm and his head after the first beating, and the medical report, which indicated that Naul suffered from "blunt trauma" and "post-traumatic oedema" to his right arm and forehead. We do not view these two pieces of evidence – Naul's testimony and the report – to be contradictory at all; the information contained in his testimony and the report are certainly not mutually exclusive. Because blunt trauma, swelling, and cuts are all consistent with the type of beating that Naul described, we actually view the medical report as corroborative of Naul's testimony, rather than contradictory to it. Additionally, the report indicates that Naul was injured in the same

8

two locations – his right arm and his forehead – as he indicated himself in his testimony. Moreover, even if we concluded that a discrepancy existed here, we would find such an inconsistency to be minor, and insufficient to provide substantial evidence supporting an adverse credibility finding.

Next, the IJ mentioned three discrepancies that she noticed when comparing Naul's testimony to the affidavits from his friends and family members. Naul submitted affidavits signed by his mother, Munsamy, his uncle, a childhood friend, a minister, and a Justice of the Peace. All six of these affidavits generally support the major elements of Naul's story. However, the IJ focused on inconsistencies she perceived with respect to three of the affidavits. In one affidavit, Naul's mother indicates that she left her home to live with her brother "due to the number of threats [she] received from [Naul's] political persecutors." But, according to Naul's testimony, his mother was never directly threatened; her neighbor told her of threatening comments made by PNC members who came looking for Naul. In another affidavit, a Justice of the Peace indicated that he knew of the two altercations during which "Naul was being beaten by [a] gang of protesters." But, according to Naul's testimony, he was beaten by PNC members who confronted him; Naul made no mention of any protests. In a third affidavit, Munsamy stated that he was a PPC Committee member, but said nothing about holding a position in the Parliament, as Naul indicated in his testimony.

Again, we do not find any of these documents to affirmatively contradict any portion of Naul's testimony. His mother could have "received" threats passed along to her by her neighbor, and the Justice of the Peace could refer to members of the opposing political party as "protesters." Munsamy might not have mentioned his role as a member of Parliament, or Naul could have confused his status as a ranking member of the PPP with that of a government official. Further, the remaining three affidavits, each of which supports Naul's testimony, were in no way discredited. But even if we could countenance the IJ's interpretation of these documents as contradictory to Naul's testimony, we conclude that the "discrepancies" relied upon by the IJ were precisely the type of "minor inconsistencies" that are unrelated to the heart of Naul's asylum claim. See Gao, 299 F.3d at 272; Senathirajah, 157 F.3d at 221. Thus, they cannot form a proper basis for rejecting Naul's claim via an adverse credibility determination.[1]

Finally, the IJ found that "the background documents presented . . . do not support [Naul's] extremely generalized and almost hysterical claims . . . ." This characterization of Naul's testimony was presumably caused by certain broad statements made by Naul

---

[1] The IJ also noted the fact that Naul, during an interview at the airport, gave his grandparents' names when asked for his parents' names. However, Naul attempted to explain this in his testimony, stating that he misunderstood the question and was later prohibited from changing his answers before he signed the interview statement. Given the fact that we are generally skeptical of reliance upon statements made in airport interviews, see Dia v. Ashcroft, 353 F.3d 228, 257 (3d Cir. 2003), and given Naul's explanation, we do not think this would provide a permissible basis for the IJ's adverse credibility determination.

10

near the conclusion of his testimony, indicating that Indo-Guyanese people, including government officials, would continue fleeing Guyana due to the abuses they suffer at the hands of the PNC-dominated, Afro-Guyanese police forces. While the IJ might have correctly believed that Naul was exaggerating a bit in the final portion of his testimony, his description of the conditions in Guyana and his own experiences there appear to be confirmed by numerous newspaper and magazine articles submitted by Naul as supplemental background information.[2] And, nothing in the State Department's Country Report is directly contradictory. His exaggerations convey his fear, which is supported by his documentary submissions, as well as indications in the Country Report that ethnic tensions have resulted in instances of abuse by the police, and we do not think that they undermine the rest of his testimony sufficiently to reject his account as incredible.

Thus, we conclude that none of the reasons listed by the IJ amount to substantial evidence to support an adverse credibility determination here. The documentary evidence, some of which the IJ barely referenced in her opinion, seems to largely support Naul's account. Accordingly, we are compelled to reject the IJ's finding that Naul lacked credibility.

---

[2]We also note that similar claims of persecution have been asserted in asylum cases involving other Indo-Guyanese petitioners, including two cases that resulted in non-precedential opinions from our own court. See Bridgemohan v. Ashcroft, No. 03-1763, 2004 WL 857328 (3d Cir. Apr. 22, 2004) (not precedential); Arjune v. Ashcroft, No. 01-1468, 2001 WL 1683808 (3d Cir. Dec. 18, 2001) (not precedential).

IV.

After rejecting Naul's claim on the basis of the adverse credibility determination, the IJ went on to examine, in the alternative, whether Naul should be granted asylum assuming that he had provided credible testimony. The IJ concluded that Naul would still not be eligible for asylum, finding that Naul had not been subjected to persecution on account of his ethnicity or political opinions, that Naul had not shown that the Guyanese government was unwilling or unable to prevent the type of treatment Naul described, and that Naul had not demonstrated that he would be unable to avoid future persecution by relocating within Guyana. Because we conclude that each of these alternative findings are laced with the same improper skepticism that was at the heart of the adverse credibility determination, we will remand the case to the agency in order to give the IJ another chance to consider Naul's application in light of our opinion. See Ezeagwuna v. Ashcroft, 325 F.3d 396, 411 (3d Cir. 2003); see also INS v. Ventura, 537 U.S. 12, 16-17 (2002). To demonstrate why a remand is necessary, we will briefly address each of the IJ's alternative conclusions.

Regarding past persecution, the IJ thought that neither incident described by Naul amounted to persecution. As to the first incident, the IJ stated that getting "beaten up" for "stray[ing] out of his area into an Afro-Guyanese village" did not "rise to the level of persecution." As to the second, the IJ concluded that the motivation for the beating and threats was economic in nature, and was not related to any of the protected grounds – in

12

other words, Naul was beaten up by other competing mechanics because of the success of his business. We question both of these conclusions.

Naul testified that during both of his encounters with the PNC members, his assailants threatened to kill him; the second time, they did so while wielding a gun.[3] Further, his testimony also seems to establish that there were, at the very least, ethnic overtones to both encounters. According to Naul, the cause of the first beating was his status as an Indo-Guyanese and his assistance to the PPP political party. His testimony also indicated that the cause of the second encounter was his ethnicity, perhaps in combination with his profession; according to Naul, and acknowledged by the IJ, his Afro-Guyanese assailants specifically indicated that they did not want an Indian mechanic working in their village.[4]

We perceive that the IJ, in concluding that these attacks did not amount to persecution or were not attributable to Naul's nationality, carried over certain feelings harbored regarding Naul's credibility into her alternative findings. Her discussion of the

---

[3]As we have previously observed, "persecution" includes "threats to life, confinement, torture, and economic restrictions so severe that they constitute a threat to life or freedom." Fatin v. INS, 12 F.3d 1233, 1240 (3d Cir. 1993) (emphasis added).

[4]As Naul asserts, an asylum petitioner need not demonstrate that the protected ground, such as ethnicity, was the exclusive motivation behind the alleged persecution. See Chang v. INS, 119 F.3d 1055, 1065 (3d Cir. 1997) (holding that asylum applicants need only offer evidence from which it is reasonable to believe that the harm "was also motivated, at least in part," by protected grounds); In re S-P- (Interim Decision), 21 I. & N. Dec. 486 (BIA 1996) (discussing the burden of proof on petitioners in "mixed motive" cases).

13

attacks and her explanation of why they did not support Naul's claim of past persecution were tainted by her reluctance to believe Naul's testimony regarding the nature of his injuries and the racial overtones of his encounters with the Afro-Guyanese PNC members. Thus, on remand, the IJ should reexamine the question of whether Naul suffered past persecution, and she should do so in a manner that is consistent with this opinion.[5]

The IJ's second alternative conclusion involved the Guyanese government's willingness and ability to control the type of abuses described by Naul. Naul and his mother sought help from the local police forces on three separate occasions, and each time the police explicitly refused to help them by taking a report and investigating, despite the fact that Naul was able to name the men who assaulted him. The officers, who constitute an arm of the government, offered no explanation for their refusal or their inability to help Naul. However, the IJ was quite obviously skeptical of Naul's claim that he was unable to find an Indo-Guyanese police officer. She also seemed hesitant to believe that Afro-Guyanese officers responded to complaints in the manner described by Naul, despite the fact that Naul had offered numerous articles describing precisely that

---

[5]Naul also challenges the IJ's conclusion that he failed to demonstrate that there is a pattern or practice of persecution against ethnic Indians in Guyana. We are inclined to agree with the IJ that no such pattern or practice exists in a case such as this one, where Naul belongs to the slightly dominant political and ethnic group, but we need not discuss the issue further here in light of our conclusions on the other issues. If Naul succeeds in showing that he was subjected to past persecution when the agency reconsiders his case in light of this opinion, he will benefit from a presumption that his fear of future persecution is well-founded. See 8 C.F.R. § 208.13(b)(1). Thus, his failure to show a pattern or practice of persecution in Guyana will not be fatal to his asylum claim.

14

sort of behavior on the part of local police forces. The IJ's reluctance to credit these aspects of Naul's testimony demonstrates, again, that her credibility determination impacted her view on this issue as well. Therefore, she should revisit the question of whether Naul's persecution is attributable to the Guyanese government in light of our discussion in this opinion, as well as the background evidence offered by Naul.[6]

And finally, as to relocation, the IJ determined that the evidence offered by Naul did not establish that he would have been unable to safely relocate within Guyana. However, if, as we have outlined above, Naul actually did prove that he was subjected to past persecution, he benefits from a presumption that internal relocation is unreasonable. See 8 C.F.R. § 208.13(b)(3)(ii). To rebut that presumption, the burden would lie with the Government to establish "by a preponderance of the evidence that, under all the circumstances, it would be reasonable for the applicant to relocate." Id. In light of our decision regarding the other issues raised by Naul, we conclude that this issue may require further examination on remand as well.

---

[6]Unlike the IJ, we do not think that Naul had any further duty to visit distant police stations in search of an Indo-Guyanese officer, or to contact higher-ranking members of the PPP-controlled government to report the failings of the PNC-dominated police forces. Unheeded attempts to report multiple assaults, especially when considered in light of the background documentary evidence offered by Naul regarding exactly this type of uncontrolled police inaction, can be sufficient to show that the government was unable or unwilling to prevent the type of abuse that Naul suffered. Cf. Surita v. INS, 95 F.3d 814, 819-20 (9th Cir. 1996) (finding past persecution where an Indo-Fijian reported repeated robberies, but local police refused to protect her or arrest her assailants). The fact that Naul is a member of the slightly dominant ethnic and political group in a deeply divided nation is not fatal to his claim of past persecution.

15

V.

For the reasons stated above, we conclude that the IJ's adverse credibility determination was not supported by substantial evidence in the record. We also conclude that the IJ's alternative findings were likewise infected by improper skepticism of Naul's testimony. Accordingly, we will grant the petition for review, vacate the order of removal, and remand the matter to the BIA with instructions to refer the matter to the IJ for further proceedings consistent with this opinion.

_____