

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-30-2002

# Ezeagwuna v. Atty Gen USA

Precedential or Non-Precedential: Precedential

Docket No. 01-3294

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation

"Ezeagwuna v. Atty Gen USA" (2002). *2002 Decisions.* Paper 461.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/461

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

    Filed July 30, 2002

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 01-3294

GLORY OBIANUJU EZEAGWUNA,
    Petitioner

v.

JOHN ASHCROFT, ATTORNEY GENERAL
OF THE UNITED STATES,
    Respondent

On Petition for Review of an Order of the
Board of Immigration Appeals
(D.C. No. 0090-1:A76 142 746)

Argued April 25, 2002

Before: BECKER, Chief Judge, SCIRICA, and
RENDELL, Circuit Judges

(Filed: July 30, 2002)

        Sidney S. Rosdeitcher [ARGUED]
        Paul, Weiss, Rifkind, Wharton &
        Garrison
        1285 Avenue of the Americas
        New York, NY 10019-6084
        Counsel for Petitioner
         Glory Obianuju Ezeagwuna




        Michael T. Dougherty [ARGUED]
        United States Department of Justice
        Office of Immigration Litigation
        1331 Pennsylvania Avenue, N.W.
        Washington, D.C. 20530

        Richard M. Evans
        Terri J. Scadron
        John M. McAdams, Jr.
        United States Department of Justice
        Office of Immigration Litigation
        P. O. Box 878
        Ben Franklin Station
        Washington, D.C. 20044

        Brian G. Slocum
        United States Department of Justice
        1331 Pennsylvania Avenue, N.W.
        Washington, D.C. 20530
        Counsel for Respondent

John Ashcroft, Attorney General
of the United States

James C. La Forge
Chadbourne & Parke
539 Valley Road
Upper Montclair, NJ 07043
Counsel for Amicus-Appellant
Lawyers Committee for
Human Rights

OPINION OF THE COURT

RENDELL, Circuit Judge.

Glory Obianuju Ezeagwuna ("Ms. Obianuju"), a citizen of
Cameroon, seeks political asylum and withholding of
deportation. She claims to have been persecuted because of
her membership in two political organizations in Cameroon
that represent the interests of the English-speaking
minority population. The Immigration Judge ("IJ") denied
her application, and the Board of Immigration Appeals
("BIA" or "Board") dismissed her appeal. The BIA's decision

2

was based on a finding that Ms. Obianuju had submitted
fraudulent documents and therefore was not credible. The
BIA relied almost entirely on a letter from the Department
of State that contained the conclusions of an investigation
in Cameroon. We conclude that reliance on this letter
denied Ms. Obianuju her due process rights and
undermined the fundamental fairness of the administrative
process. Further, we find that a reasonable factfinder would
be compelled to conclude that Ms. Obianuju was persecuted
because of her political opinions and faces a clear
probability of persecution if returned to Cameroon. We will
accordingly grant the petition for review, find Ms. Obianuju
eligible for asylum, order withholding of deportation, and
remand to the BIA to present this matter to the Attorney
General for the exercise of his discretion.

I.

A. Background

Glory Obianuju Ezeagwuna, a citizen of Cameroon, seeks
asylum in the United States. Prior to her alleged
persecution she lived in Bamenda, a city in the Northwest
Province of Cameroon. She is a member of the English-
speaking minority population, French being the language of
the majority. She claims to have been persecuted because
of her political opinion, and she points to mistreatment
resulting from her membership in two political groups
representing the interests of this Anglophone population --
the Social Democratic Front ("SDF ") and the Southern
Cameroons National Council ("SCNC").

Ms. Obianuju provided a detailed account of her abuse in

affidavits, testimony, and corroborating documents.
Following is a summary of the account presented by
Ms. Obianuju in her affidavit in support of her application
for asylum.

Ms. Obianuju's parents and other family members were
very active members of SDF. In 1994, Ms. Obianuju began
participating in SDF activities, and in 1996, at the age of
eighteen, she became an official member of SDF.
Ms. Obianuju tells of three times that she was jailed and
physically abused because of her political activism. The

first incident took place in 1996 when she joined other SDF
members in protesting the appointment of Francis Faie
Yengo as the leader of the Bamenda Urban Council.
Government police sprayed tear gas on the protestors and
arrested them. Ms. Obianuju claims that she was then
dragged through the gravel on her knees and taken by force
to Bamenda Central Prison where she was beaten on the
soles of her feet and on her knees with police sticks.
Ms. Obianuju's parents retained an attorney, Robert Nsoh
Fon, to obtain her release from prison and on the fourth
day she was released on bail. Upon her release she visited
a doctor, Dr. Nji, who applied ointment to her hands and
knees, and provided her with painkillers.

Next, in January 1997, Ms. Obianuju and other students
marched to protest a substantial fee increase for taking a
university entrance exam only imposed in the English-
speaking areas of Cameroon. Ms. Obianuju marched at the
front of the group. The government police began beating the
students with their belts and spraying tear gas in an effort
to disperse the students. She was kicked in the stomach
and then dragged by an officer through the gravel. In
prison, she was further hit and kicked by the officers. Her
attorney was able to negotiate her release from prison. After
her release, Ms. Obianuju left the SDF and became a
member of the SCNC. Although the SCNC did not hold
demonstrations, its goals were otherwise similar to the
SDF.

In March and April 1997 there were a series of attacks on
police and civilian establishments in Bamenda. According
to Ms. Obianuju, the government blamed the SCNC for the
attacks, but she denies any involvement. Ms. Obianuju
claims that a few weeks after the attacks the police entered
her home at 10 p.m. while she was asleep and physically
removed her from her home without providing any
explanation. During the course of the family's struggle to
protect her, a police officer cut her mother's hand with a
knife. Ms. Obianuju was taken to prison and placed in a
cell with other SCNC members where she remained for six
days. During the first day she and the others were beaten
with police sticks on the soles of their feet and on their
knees. During the second day an officer removed her from

her cell and attempted to rape her, but was stopped by another officer. He bit her on the chest and scratched her back with his nails, leaving scars. She was repeatedly kicked in the stomach and hit across her face during the remainder of her detention. When her lawyer sought her release, he was told that she was being imprisoned for the March and April attacks mentioned above. On April 30, she was released upon payment of 1,500,000 francs.

Upon release she was taken to a doctor, because she was discharging blood. She subsequently became more ill and underwent an emergency appendectomy because her appendix "had been destroyed" by the abuse she suffered. She remained in the hospital for thirty days thereafter.

On July 31, 1997, Ms. Obianuju's attorney informed her that the police had a warrant for her arrest claiming that she had been improperly released in April. She therefore traveled to Bafut, a city in the Northwest province, to stay with a family friend, George Moma. She remained in hiding there indoors until December 1998. She then obtained a fake passport in the name of George Moma's sister, Francisca Biwie Moma. She used this passport to fly to Jamaica in February 1999. She stayed with a series of new acquaintances in Jamaica for three weeks. At that time her return trip was scheduled, and she requested asylum from the Jamaican immigration office, but they denied her application and attempted to take her into custody. She again went into hiding. A Jamaican provided her with a fake English passport in the name of Rebecca Channon, and she left on a flight to Newark, New Jersey on August 13, 1999. Upon her arrival at Newark International Airport, United States immigration officers determined that the passport was false, and upon questioning by the INS, Ms. Obianuju sought political asylum. Ms. Obianuju was deemed inadmissible by the INS under sections 212(a)(6)(C)(i)1 and 212(a)(7)(A)(i)(I)2 of the INA ("Immigration

---

1. "Any alien who, by fraud or willfully misrepresenting a material fact, seeks to procure (or has sought to procure or has procured) a visa, other documentation, or admission into the United States or other benefit provided under this chapter is inadmissible." 8 U.S.C. S 1182(a)(6)(C)(i).
2. A person is inadmissible if she "is not in possession of a valid unexpired immigrant visa, reentry permit, border crossing identification card, or other valid entry document required by this chapter. . . ." 8 U.S.C. S 1182(a)(7)(A)(i)(I).

and Nationality Act") because she entered the country with invalid documents, and she was detained and has remained in detention ever since. She seeks political asylum and withholding of deportation, and, in the alternative, relief under the Convention Against Torture ("CAT"). 3 She claims that Cameroonian authorities continue to look for her and believes that her well-being and even her life would be in

jeopardy if she returned to Cameroon.

B. Proceedings Before the INS

Ms. Obianuju first appeared before the Immigration Judge ("IJ") on September 2, 1999 pro se. She subsequently obtained counsel, and a hearing on the merits was held first on March 3, 2000 and continued on May 9, 2000. Ms. Obianuju testified at great length and was cross-examined by INS counsel, Irene Feldman. Ms. Obianuju submitted a large number of corroborating documents, including affidavits and declarations of family, friends, and SDF members, SDF membership cards, and U.S. State Department Country Reports. At the time of the hearing, the IJ had before her 37 exhibits provided by Ms. Obianuju and the INS. Dr. David S. Kang, a family medicine practitioner who conducted a physical examination of Ms. Obianuju on November 9, 1999, testified on her behalf. He concluded that she was credible, in part because she did not claim that every scar on her body resulted from torture. Furthermore, the scars she claimed were caused by torture were consistent with the acts she claimed caused them, specifically, scars on her knees from being dragged through the gravel, a scar on her chest from being bitten, and a surgical scar on her abdomen resulting from her appendectomy. Ms. Obianuju also moved to admit Dr. Kang's affidavit. At the close of this hearing the IJ said:

> I have spoken with, to both counsels. I need to, this matter has to be continued, of course, for the issuance of the oral decision. And of course Ms. Feldman is waiting response of the [forensic document laboratory] report regard, as to one document just recently

_____

3. As the relief provided by the CAT is subsumed by the relief provided by the grants of asylum and withholding of deportation, we will not address whether she qualifies for relief under the CAT.

6

> submitted. Therefore, this hearing is adjourned for the 26th of May, at 1 p.m. in the afternoon.4

On June 7, 2000, during a continuance of the May 26 hearing, the INS provided a two-page letter from John Larrea, Vice Consul of the Embassy of the United States in Yaounde, Cameroon (the "Larrea letter"). The Larrea letter sets forth in a summary fashion the results of an investigation conducted into five documents submitted by Ms. Obianuju: a medical certificate from her doctor in Cameroon; the arrest warrant; an application for bail; an affidavit by Ms. Obianuju's father; and, an affidavit by her attorney in Cameroon, Robert Nsoh Fon. The letter concludes that each of these documents is fraudulent. A copy of each document is attached to the Larrea letter with notations allegedly made by government officials setting forth why the document is believed to be fraudulent. No investigative report is provided, nor is there any information

about the investigation or the investigator.

In order to respond to the letter, on June 16, 2000, Ms. Obianuju's counsel requested a 30-day continuance. She explained: "An additional 30 days would enable us to address the allegations in the June 7, 2000 letter from the United States Embassy concerning Ms. Obianuju's asylum application, and make any necessary motions with regard to the findings in that letter." The continuance was granted.

On July 27, 2000, Ms. Obianuju filed a motion in limine setting forth five reasons why the Larrea letter should be excluded: 1) no foundation was laid for Larrea's opinions, 2) the letter's admission would violate the due process requirement of fundamental fairness; 3) its admission would violate INS regulations prohibiting the disclosure of asylum applications to third parties; 4) the admission of evidence based on this type of investigation would frustrate future asylum proceedings; and, 5) the letter was not authenticated in accordance with INS regulations. As

---

4. In support of her motion to reopen, Ms. Obianuju claims that this statement by the IJ closed the record. We must disagree and find that the record did not close until the IJ explicitly said so on September 21, 2000. This is further evidenced by the fact that both parties submitted new evidence in support of motions after the May hearing.

7

support for the motion, Ms. Obianuju included a July 26, 2000 affidavit from Milton Krieger, a scholar of politics in Cameroon ["first Krieger affidavit"]. 5 Dr. Krieger shared his detailed knowledge of Cameroon, particularly regarding the government's persecution of SDF and SCNC members, the U.S. Embassy's limited knowledge of the political situation in Bamenda, and the difficulty of authenticating documents in Cameroon. Finally, he explained that Ms. Obianuju's account of what occurred was credible and shared his opinion that if she returned there was "a significant probability that Ms. Obianuju would be severely harassed, beaten, tortured or possibly even killed."

On August 7, 2000, the INS moved for a continuance of the hearing set for August 9 in order to obtain an original of the Larrea Letter. On that very same day, August 7, counsel for the INS obtained a letter from Marc J. Susser, Director, Office of Country Reports and Asylum Affairs, United States Department of State (the "Susser letter"). The entire text of the Susser letter is set forth in the appendix to this opinion. Susser explained in his opening paragraph: "I am writing to forward the results of an investigation, by a Foreign Service post, of documents presented in support of the asylum application of [Glory Obianuju]. These documents were forwarded to us by your office." The Susser letter is simply a restructured version of the Larrea letter, utilizing almost the exact same language. Significantly, however, the referenced documents are not attached to the Susser letter.

Although the Susser Letter is dated August 7, 2000, it was not provided to the IJ or Ms. Obianuju's counsel until September 18, 2000, three days before the hearing date.6 On September 18, the INS sent a letter to the IJ as a response to Ms. Obianuju's motion in limine. In addition to

---

5. Milton Krieger has spent many months in Cameroon studying its political system. Since 1989 he has been to Cameroon four times and stayed there each time for between four and ten months. He is the author of African State and Society in the 1990s: Cameroon's Political Crossroads (Joseph Takougang co-author, 1998).

6. Ms. Obianuju's counsel claims not to have received the letter until September 19, 2000.

8

rebutting the arguments made in the motion in limine, the INS provided the Susser letter "since [Ms. Obianuju] has objected to the admissions of the letter from John Larrea." The INS contended:

> In an effort to provide Your Honor with an original letter, the Service respectfully submits the more recent Department of State letter in lieu of the prior submission. To date, the Service has not received the original copy of the Larrea Letter. Although the respondent has questioned the integrity of the Embassy staff, it would be beyond the realm for the respondent to question the recent letter submitted by Marc J. Susser, Director of the Office of Country Reports and Asylum Affairs.

The INS, therefore, no longer sought to admit the Larrea letter nor did it submit copies of the allegedly fraudulent documents for consideration as part of the record. It only moved for admission of the two-page Susser letter.

On September 21, 2000, the day of the hearing, counsel for Ms. Obianuju presented the IJ with a letter expressing her objections to the Susser letter, primarily reiterating the concerns set forth in the motion in limine. On September 21, the IJ heard from both counsel regarding the admissibility of the Susser letter and other documents. As the INS no longer sought admission of the Larrea letter, it was marked for identification purposes only. Without any explanation, the IJ admitted the Susser letter over Ms. Obianuju's objections. The IJ closed the record at this hearing.7

On October 30, 2000, the IJ issued a written opinion. The IJ found that Ms. Obianuju had not established that she suffered past persecution or a well-founded fear of persecution, and therefore denied her applications for

---

7. "The record is closed, but for the decision of the Court. Understood,

counsels? I will accept no further documents unless there's a showing that this document was unavailable, and is germane to the case, and it was unavailable at the, and it was clearly unavailable, and this clearly this document is extraordinary, and would clearly substantiate the respondent's claim. So the record is closed but for the submission, the issuance of the decision."

asylum, withholding of removal, and relief under the Convention Against Torture. The IJ's decision was based almost entirely on its finding that Ms. Obianuju was not credible. First, the IJ said that Ms. Obianuju's testimony seemed exaggerated and rehearsed. Second, the IJ believed that details of her testimony "simply did not add up." She pointed specifically to the implausibility of Ms. Obianuju's explanation for discrepancies with her membership cards, that she was repeatedly mistreated by officers in exactly the same manner, and that the government would search so actively for a girl who was only moderately involved in political activity. Third, the IJ found that several reports provided by the INS questioned the authenticity of documents submitted by Ms. Obianuju, as well as the veracity of her testimony. Specifically, the IJ pointed to the Susser letter, the INS Forensic Document Laboratory ("FDL") report questioning the authenticity of one SDF card, and a document entitled "Abuse of Membership of the Social Democratic Front by Asylum Seekers" prepared by the SDF in Cameroon. Finally, the IJ explained that it was unbelievable that a person in her position would be the subject of the persecution she claimed.

Ms. Obianuju filed an appeal with the Board of Immigration Appeals on November 27, 2000. On July 10, 2001, Ms. Obianuju filed a motion to supplement the record for her asylum application. She asked the BIA to consider three additional documents that were not part of the record before the IJ: an affidavit of Sister Jane Mankaa, a Cameroonian nun living in New Jersey who visited Ms. Obianuju's parents in August 2000; a second affidavit of Dr. Milton Henry Krieger commenting in part on Sister Mankaa's affidavit; and, an affidavit of Dr. Frances Gelles, a certified clinical psychologist who examined Ms. Obianuju in July 2001. All three affidavits provide support for Ms. Obianuju's version of events and bolster her credibility. Ms. Obianuju also asked the BIA to consider a June 21, 2001 memorandum from Bo Cooper, General Counsel to the INS. Cooper set forth the proper procedure to follow when conducting overseas investigations in order to ensure the confidentiality of the asylum applicant. Ms. Obianuju offered the letter as support for her argument on appeal

that the confidentiality of her application was breached by the investigation reflected in the Susser letter.

Without oral argument, the BIA issued its decision on

August 17, 2001. The BIA first denied Ms. Obianuju's motion to supplement the record. It explained: "[T]he Board is an appellate body whose function is to review, not create a record. Thus it would be inappropriate for us to accept the evidence proffered by the respondent." (citation omitted). The BIA also refused to remand to the IJ for it to consider the additional evidence, because, with the exception of Dr. Gelles's affidavit, it was "not shown that the affidavits could not have been presented on or before close of the hearing on the merits which was concluded on September 21, 2000." The BIA further found that Dr. Gelles's affidavit would not change the outcome in the case and therefore did not admit it.

The BIA then conducted a de novo review of the record and dismissed the appeal finding that the IJ's decision was correct. In the course of its analysis, however, the BIA disagreed with much of the IJ's reasoning, specifically two of the primary grounds on which the IJ relied when concluding that Ms. Obianuju was not credible. The BIA explained: "We disagree with the Immigration Judge that it is implausible that the respondent may have been abused on different occasions in similar ways or that as a rank and file member of the SDF she would not have been subject to custodial abuse." The BIA also found that the IJ's description of Ms. Obianuju's testimony did not reflect whether her demeanor was a result of rehearsal, as the IJ concluded, or instead "related to the respondent's repetition of stressful events in different venues with resulting emotional numbness." The BIA concluded: "Consequently, to the extent that the Immigration Judge's decision is based upon finding these accounts of the respondent incredible solely based upon their implausibility and/or the manner in which the testimony was provided, we disagree with the Immigration Judge."

The remainder of the BIA's decision focused on the allegedly fraudulent corroborating documents submitted by Ms. Obianuju based on the "investigation" results set forth in the Susser letter. The BIA concluded that the Susser

11

letter was properly admitted and considered by the IJ. The BIA essentially adopted the conclusions of the Susser letter and concluded that the five pieces of evidence discussed therein were fraudulent: the medical certificate from her doctor in Cameroon; the arrest warrant; the bail application; the affidavit of Ms. Obianuju's father; and, the affidavit by her attorney in Cameroon, Robert Nsoh Fon. The BIA also concluded that one of the SDF membership cards she submitted was fraudulent because of the discrepancy between the dates of contribution, beginning in 1991, and the date she claims to have joined, in 1996. The BIA specifically rejected Ms. Obianuju's explanation, supported by affidavits of SDF members, regarding the practice of backdating membership cards when a member paid dues for previous years.

The BIA's finding that the evidence described in the Susser letter was fraudulent was the linchpin of its decision:

> In essence, there is a pattern in the evidence consistent with the repeated fabrication of identities for individuals signing documents presented by the respondent and this pattern is reinforced by stamps on affidavits which appear to be fake and the failure to register documents in the High Court of Bamenda as required. We find this pattern consistent with the production of counterfeit evidence as opposed to the administrative lapses and corruption described by the respondent or intentional efforts to discredit her persecution claim.

The BIA focused on Ms. Obianuju's submission of fraudulent documents, and not the substance of the evidence supporting Ms. Obianuju's claims:

> We find that the respondent's failure to meet the burden of proving eligibility for relief is directly related to the adverse credibility determination and the presence of counterfeit evidence presented in an attempt to corroborate the respondent's account. It is the presentation of counterfeit documents to bolster her claim, rather than the failure to present any specific supporting evidence, which has resulted in the failure of proof.

12

Notwithstanding its concerns regarding the IJ's analysis, the BIA ultimately reached the same conclusion and rejected Ms. Obianuju's application due to her lack of credibility, although based on the submission of falsified documents. The BIA concluded:

> Despite the fact that we do not agree with all aspects of the Immigration Judge's decision, we see no reason to disturb the adverse credibility determination. We find that the respondent's efforts to explain and/or rebut the findings of United States officials are inadequate and that such counterfeit corroborative evidence discredits not only the specific evidence itself, but indicates an overall lack of credibility regarding the entire claim. As the adverse credibility determination is dispositive for purposes of eligibility, the respondent's appeal from the denial of her applications for asylum, withholding of removal, and relief under the CAT is dismissed.

(citations omitted).

Ms. Obianuju then filed this petition for review.

II.

We have jurisdiction to review the BIA's final order

pursuant to 8 U.S.C. S 1252(a)(1). The BIA had jurisdiction under 8 C.F.R. S 3.1(b)(9). As it conducted an independent analysis of the record, we limit our review to the BIA's final order. Abdulai v. Ashcroft, 239 F.3d 542, 549 (3d Cir. 2001). We review the BIA's findings of fact, including an adverse credibility finding, to determine whether they are based on substantial evidence. "Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Senathirajah v. INS, 157 F.3d 210, 216 (3d Cir. 1998) (quoting Turcios v. INS, 821 F.2d 1396, 1398 (9th Cir. 1987)). We will uphold the District Court's findings of fact unless the evidence compels the contrary conclusion. INS v. Elias-Zacarias, 502 U.S. 478, 481 & n.1 (1992); Abdille v. Ashcroft, 242 F.3d 477, 484 (3d Cir. 2001). However, we have also explained that "deference is not due where findings and conclusions are based on inferences or

13

presumptions that are not reasonably grounded in the record, viewed as a whole." Balasubramanrim v. INS, 143 F.3d 157, 162 (3d Cir. 1998) (quoting Cordero-Trejo v. INS, 40 F.3d 482, 487 (1st Cir. 1994)). Furthermore, whether Ms. Obianuju's due process rights were violated is a legal question which we subject to de novo review. Chong v. INS, 264 F.3d 378, 386 (3d Cir. 2001).

The Immigration and Nationality Act ("INA") provides that "[t]he Attorney General shall be charged with the administration and enforcement" of the INA. 8 U.S.C. S 1103. The Attorney General has the discretion to grant asylum to an alien applicant "if [he] determines that such alien is a refugee within the meaning of section 1101(a)(42)(A)." 8 U.S.C. S 1158(b)(1). However, this discretion is not unfettered. For example, he abuses his discretion if he does not specify the reasons for refusing to exercise his denial. de la Llana-Castellon v. INS, 16 F.3d 1093, 1098 (10th Cir. 1994). Furthermore, the stated reasons must not be "arbitrary, irrational, or contrary to law." Andriasian v. INS, 180 F.3d 1033, 1040 (9th Cir. 1999). As provided by the INA, the Attorney General has authorized "the Board [to] exercise such discretion and authority conferred upon the Attorney General by law." 8 C.F.R. S 3.1(d)(1). A "refugee" is defined as "any person who is outside any country of such person's nationality . . . and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. . . ." 8 U.S.C. S 1101(a)(42)(A).

Ms. Obianuju claims that she was persecuted because of her political opinion, and has a fear of further persecution if she returns to Cameroon. If an asylum applicant can establish that she was persecuted, then she does not need to establish a fear of future persecution. The regulations provide: "An applicant who has been found to have established such past persecution shall also be presumed

to have a well-founded fear of persecution on the basis of the original claim." 8 C.F.R. S 208.13(b)(1). While this presumption may be rebutted by the government in specific circumstances, for example, if there has been a

14

fundamental change in the country's circumstances, such provisions are not implicated here. See 8 C.F.R. S 208.13(b)(1)(i)(A)-(B). Therefore, Ms. Obianuju only needs to prove past persecution on the basis of her political opinion to establish that she is a refugee. The burden is on the applicant to establish that she qualifies as a refugee under the statute. 8 C.F.R. S 208.13(a); see Balasubramanrim, 143 F.3d at 161.

While the decision to grant asylum is discretionary, if an applicant demonstrates qualification for withholding of removal under INA S 241(b)(3) the applicant cannot be removed to the country where the persecution occurred. INS v. Stevic, 467 U.S. 407 (1984); Cardoza-Fonseca, 480 U.S. at 428-29 & n.5, n.6. "To qualify for mandatory relief under withholding of deportation, . . . [the applicant] must show that it is more likely than not that he will face persecution if he is deported." Li Wu Lin v. INS, 238 F.3d 239, 244 (3d Cir. 2001). However, where past persecution has been established, the threat of future persecution is assumed and the burden in on the INS to prove by a preponderance of the evidence that there has been a fundamental change in circumstances or that the individual could avoid a future threat by relocating within the country. 8 C.F.R. S 208.16(b)(1).

Our analysis will proceed in three parts. First, we must consider Ms. Obianuju's due process challenge to the BIA's reliance on the Susser letter. Second, we will consider Ms. Obianuju's claim that the BIA abused its discretion when it refused to permit her to supplement the record. Finally, we will consider whether the BIA's conclusion that Ms. Obianuju failed to qualify for asylum and withholding of deportation was supported by substantial evidence.

A. Reliance on Susser Letter Violated Ms. Obianuju's Due Process Rights

We must first consider Ms. Obianuju's challenge to the BIA's consideration of the Susser letter. This is a crucial, threshold consideration, because, as we noted, the BIA's decision was based almost entirely on the Susser letter, and it is clearly the underpinning for the BIA's conclusion that Ms. Obianuju's testimony was not credible and that

15

her corroborative evidence was fraudulent. Without the Susser letter, the majority of the BIA's reasoning actually supports Ms. Obianuju's case. Because we believe that the BIA's reliance on the letter violated her Fifth Amendment

right to due process, we need not address Ms. Obianuju's other challenges to the letter.

Due process protections are afforded to aliens facing removal. See, e.g., Abdulai v. Ashcroft , 239 F.3d 542, 549 (3d Cir. 2001) ("Despite the fact that there is no constitutional right to asylum, aliens facing removal are entitled to due process."); Chong v. INS, 264 F.3d 378, 386 (3d Cir. 2001) ("Aliens facing removal are entitled to due process."). Because the Federal Rules of Evidence do not apply in asylum proceedings, "[t]he test for admissibility of evidence . . . is whether the evidence is probative and whether its use is fundamentally fair so as not to deprive the alien of due process of law." Bustos-Torres v. INS, 898 F.2d 1053, 1055 (5th Cir. 1990); see Lopez-Chavez v. INS, 259 F.3d 1176, 1184 (9th Cir. 2001) ("The sole test governing the admission of evidence in deportation proceedings is whether the evidence is probative and its admission is fundamentally fair.") (quotation omitted). As the Court of Appeals for the Second Circuit has explained: "In the evidentiary context, fairness is closely related to the reliability and trustworthiness of the evidence." Felzcerek v. INS, 75 F.3d 112, 115 (2d Cir. 1996). Therefore, our analysis as to whether an individual's constitutional rights are violated turns on whether the evidence considered by the BIA is reliable and trustworthy. For the reasons discussed below, we find that the admission of the Susser letter violated Ms. Obianuju's due process rights.

Succinctly stated, the Susser Letter does not satisfy our standards of reliability and trustworthiness. Initially, we are troubled by the dates of the INS's procurement of the Susser Letter and the timing of its being provided to Ms. Obianuju's counsel and the IJ a few days before the final hearing. As we noted above, the date that INS counsel requested an extension in order to obtain the original of the Larrea letter -- August 7, 2000 -- is the very same date that appears on the Susser letter. However, the INS only provided the Susser letter to the IJ and Ms. Obianuju's

16

counsel nearly six weeks later, on September 18, 2000, when it sought to introduce it into evidence as a replacement for the Larrea letter which was ultimately marked for identification purposes only. Furthermore, Susser noted in his August 7 letter: "These documents were forwarded to us by your office."

Second, although hearsay can be admitted in asylum cases under certain circumstances, see, e.g., Kiareldeen v. Ashcroft, 273 F.3d 542, 549 (3d Cir. 2001), reliance on such evidence here raises the precise concerns that are fundamental to its general inadmissibility in civil proceedings, and raises concerns that it is not fundamentally fair. As we have previously explained: "Hearsay is generally inadmissible because the statement is inherently untrustworthy: the declarant may not have been under oath at the time of the statement, his or her

credibility cannot be evaluated at trial, and he or she cannot be cross-examined." U.S. v. Reilly, 33 F.3d 1396, 1409 (3d Cir. 1994) (quotation omitted). Although the Federal Rules do not apply in this case, exceptions set forth in the Rules focus on trustworthiness, further indicating why we regard hearsay with a level of suspicion. See, e.g., Fed. R. Evid. 803(6)-(8) ("Hearsay Exceptions; Availability of Declarant Immaterial"); Fed. R. Evid. 804(b)(3) ("Hearsay Exceptions; Declarant Unavailable"); Fed. R. Evid. 807 ("Residual Exception").

The Susser letter is multiple hearsay of the most troubling kind. It seeks to report statements and conduct of three declarants who are far removed from the evidence sought to be introduced. They are purportedly individuals who told the investigator that certain aspects of the documents appeared to be fraudulent. Not only does Susser have no direct knowledge of the investigation, he did not even directly communicate with John Larrea, the declarant whose hearsay statements he is repeating. Therefore, the current speaker -- Susser -- was unable to even evaluate the credibility of the immediate preceding declarant-- Larrea -- who of course was himself only a proponent of hearsay. Further, we do not know whether Larrea had any interaction with "the investigator," only referred to as "she," who reports to Larrea what others have purportedly told

17

her. Given that the consul is in Yaounde and the investigation necessarily took place in Bamenda, it seems entirely possible that Larrea's sole source for the hearsay statements was the notations written on the document. Therefore, Larrea would also have been unable to judge the credibility of the investigator, also a proponent of hearsay. Therefore, Susser was three steps away from the actual declarants; all we know about the two individuals who have forwarded these written statements is that one is a Cameroonian Foreign Service National who conducted"an investigation" for the U.S. Embassy in Cameroon and the other is John Larrea, who worked as Vice Consul for the U.S. Embassy in Cameroon but now, according the INS, cannot be located by the Government.8

A comparison of the letters shows that Susser simply repeated Larrea's representations with slight variations in sentence construction, bolstering the conclusion that Susser's knowledge of the investigation was limited solely to the Larrea letter itself.9 Consideration of the first representations, regarding the medical certificate, is illustrative. Larrea explained:

> The Director of Administrative Affairs in the Provincial Hospital of Bamenda told us that no doctor named Chefor James N. has ever worked at the hospital. He added that there is no medical record at the hospital for Glory Obianuju and the round stamp and the form used for the Medico-Legal Certificate are fake. It is our conclusion that this document is fraudulent.

Susser similarly stated:

_____

8. While counsel for Ms. Obianuju suggested that Embassy personnel often had pressures on them which could lead to less than accurate reports, and the INS contends that these individuals would not risk their jobs to undermine an asylum application, we make no judgment regarding the veracity or motives of these individuals. Our analysis is based not on these aspects, but on the information the BIA had before it when it based its decision on the Susser letter.

9. The Susser letter does not recite Larrea's statement that he "does not believe that any claims for asylum in recent years based upon political beliefs or SDF membership have any merit." Larrea's statement is in direct conflict with the State Department Country Reports on Cameroon.

18

> Regarding the Medico Legal Certificate, the Director of Administrative Affairs in the Provincial Hospital of Bamenda stated that the round form and the stamper used for the Certificate are fake, and that there is no medical record at the hospital for Glory Obianuju. He also noted that no doctor by the name of James N. Chefor has ever worked at the hospital. The investigator in the U.S. Embassy in Yaounde, Cameroon, concluded that this document is fraudulent.

Susser provided no information in his letter which was not already stated in almost the precise same words in the Larrea letter. The INS has not contended before us or the BIA that Susser has any personal or even second-hand knowledge of the investigation. His knowledge is limited to the Larrea letter which was not even sought to be admitted in this case because of the INS's inability to obtain the original.

Third, we are concerned that the INS is attempting to use the prestige of the State Department letterhead to make its case and give credibility to the letter's contents. As we have previously noted,

> the Board's decisions cannot be sustained simply by invoking the State Department's authority. We are expected to conduct review of the Board's decisions, and that procedural safeguard would be destroyed if the Board could justify its decisions simply by invoking assertions by the State Department that themselves provide no means for evaluating their validity. See Galina v. INS, 213 F.3d 955, 958-59 (7th Cir. 2000). The Board cannot hide behind the State Department's letterhead.

Li Wu Lin v. INS, 238 F.3d 239, 246 (3d Cir. 2001). This seems to be precisely what the INS intended to do in this case, as it explained: "Although the respondent has questioned the integrity of the Embassy staff, it would be

beyond the realm for the respondent to question the recent letter submitted by Marc J. Susser, Director of Office of Country Reports and Asylum Affairs."

Fourth, partially due to the multiple levels of hearsay involved here, we have absolutely no information about what the "investigation" consisted of, or how the investigation was conducted in this case.10 In combination with the concerns we note above, we believe that the complete dearth of information about the investigator or the investigation undermines the Susser letter as not only untrustworthy, but also unhelpful. Further adding to our concern, Dr. Milton Krieger, a scholar of politics in Cameroon, expressed his belief "that it is very difficult to prove and/or disprove the authenticity of documents created in Cameroon since political tensions and administrative lapses and corruption intensified in the early 1990s." We also agree with Ms. Obianuju's contention that the persons contacted provided only indirect attacks as to the genuineness of the documents. For instance, rather than locate the individual who supposedly signed the warrant, or confirm through authorities that such person existed, the investigator presented the warrant to a different magistrate who states: "After a thorough search in my chambers, I have not been able to get any trace of evidence that a warrant of arrest was ever issued." JA41. There is no reason to expect that the warrant would be in this magistrate's chambers.

We have previously expressed concern about the BIA's attributing significance to activities such as interviews at airports when it lacked key information regarding the manner in which interviews were conducted. Balasubramanrim v. INS, 143 F.3d 157, 164 (3d Cir. 1998); Senathirajah v. INS, 157 F.3d 210, 216 (3d Cir. 1998). Although we did not consider whether there was a due process violation in those cases, we did conclude that the BIA's adverse credibility determination was faulty because the airport interviews were not "valid grounds upon which

---

10. The Lawyers Committee for Human Rights filed an amicus curiae brief arguing that we should rule the Susser letter inadmissible because the confidentiality of Ms. Obianuju's asylum application was violated by the investigation. We agree that the guarantee of confidentiality is significant, but the issue in this case is resolved by the violation of Ms. Obianuju's due process rights and therefore we do not reach this argument.

to base a finding that the applicant [was] not credible." Balasubramanrim, 143 F.3d at 164 (quotation omitted); see Senathirajah, 157 F.3d at 216. In Balasubramanrim, we noted that we did "not know how the interview was conducted or how the document was prepared." 143 F.3d at

162. In Senathirajah, relying in large part on our reasoning in Balasubramanrim, we likewise were troubled by the interview because "[t]he government offered no testimony as to the circumstances under which that affidavit was obtained." 157 F.3d at 218. The manner of eliciting such information is crucial to their probative value. Similarly, here, the nature of the purported "investigation" is a matter of pure conjecture and can provide no basis for a finding of falsification on the part of Ms. Obianuju.

We find that the BIA violated Ms. Obianuju's due process rights by basing its credibility finding almost entirely on the Susser letter, because it appears neither reliable nor trustworthy. As in Lin, Balasubramanrim , and Senathirajah, "[t]he Board's performance in this case was less than it should have been." Lin, 238 F.3d at 248.

B. Additional Evidence

Ms. Obianuju moved for the BIA to reopen the record in order to consider four additional pieces of evidence. Our review of the BIA's denial of the motion to reopen is for abuse of discretion. Lu v. Ashcroft, 259 F.3d 127, 131 (3d Cir. 2001). The regulations provide: "A motion to reopen proceedings shall not be granted unless it appears to the Board that evidence sought to be offered is material and was not available and could not have been discovered or presented at the former hearing." 8 C.F.R. S 3.2(c)(1). The materiality of the evidence is quite apparent. Sister Mankaa's affidavit describes in part a visit she had with Ms. Obianuju's parents in Cameroon during which they expressed their concern for their daughter and detailed what she had experienced and spoke of the danger she would face if she returned. The second affidavit from Dr. Krieger expresses his opinion that Sister Mankaa's description of the situation in Cameroon was consistent with his own experience and knowledge. Finally, the psychologist concludes in his report that "Ms. Obianuju possesses a psychiatric profile consistent with and strongly

corroborative of her claim that she was a victim of persecution and continues to suffer the effects of those experiences." The issue then is whether each piece of evidence could not have been available before the record closed in September 2000 and even if it could not have been, such that the reopening may have been permissible, whether the BIA's denial was an abuse of discretion.

However, we need not reach this issue because we conclude below that the record before us provides a sufficient basis upon which to conclude that Ms. Obianuju qualifies for asylum and withholding of removal. While we find the BIA's summary rejection of the motion somewhat troubling in light of Ms. Obianuju's obvious inability to respond in a timely fashion to a substantial piece of evidence provided to her only two days before the hearing, we find it unnecessary to conduct this analysis.

C. Qualification for Asylum

At this point, we consider whether the BIA's
determination that Ms. Obianuju did not qualify for asylum
and withholding of deportation were supported by
substantial evidence. See Chang v. INS, 119 F.3d 1055,
1065-66, 1068 (1997) (reversing the BIA and concluding
that petitioner is eligible for asylum because "a reasonable
fact-finder would be forced to conclude that [petitioner]
ha[d] shown the requisite fear of persecution"). While we
review the BIA's findings based on the administrative
record, the Susser letter must first be removed from that
record because of our ruling that its consideration violates
Ms. Obianuju's due process rights. Based on the record
before the BIA, a reasonable factfinder would have to
conclude that Ms. Obianuju was persecuted because of her
political opinion and is therefore a "refugee" as defined by
the statute and satisfies the requirements for asylum.11 As

_____

11. The INS places significant weight on a document from the SDF
explaining that asylum seekers have been known to fraudulently claim
membership in their organization in order to obtain asylum in various
countries. While this document can be useful, the fact that some
individuals fraudulently make claims does not eliminate the
government's burden to show that Ms. Obianuju made a fraudulent
claim of membership in this particular case.

the government has not rebutted the presumption that she
also faces a likelihood of future persecution if she returns
to Cameroon, we find that she is also entitled to
withholding of deportation.

We conclude that Ms. Obianuju's story is consistent.12 As
we reject the Susser letter because it violates principles of
fundamental fairness, we also cannot conclude that
Ms. Obianuju submitted fraudulent documents. Therefore
the BIA's adverse credibility determination has virtually no
basis, and is certainly not supported by substantial
evidence. The credibility of Ms. Obianuju's story is further
confirmed by the consistency of the story she presented to
her various questioners, as well as the affidavits of those
familiar with her plight and documents illustrating her
story. Although her credible testimony alone may be
sufficient to satisfy her burden, she has submitted
numerous documents that corroborate her claims. See 8
C.F.R. S 208.13(a) ("The testimony of the applicant, if
credible, may be sufficient to sustain the burden of proof
without corroboration."). The evidence discussed in the
following paragraphs both boosts her credibility and
corroborates her claim of persecution.

David S. Kang, M.D., a family medicine practitioner who
has examined numerous asylum applicants, conducted a
physical examination of Ms. Obianuju while she was in
detention. His examination report, as well as his testimony

before the IJ, is powerful evidence in Ms. Obianuju's favor. He recounted her version of the events surrounding her torture in Cameroon, and described the scars that she had on her body and her explanation of how they occurred. He concluded: "It is my assessment that Miss Obianuju has been a victim of torture. Her explanations of scars and injury are consistent with the physical finding. Her explanation of the events as well as the mechanism is

_____

12. It is important to note that the BIA never suggested that the evidence provided by Ms. Obianuju did not support her claim. Instead, it focused on the fraudulent documents. The BIA explained:"It is the presentation of counterfeit documents to bolster her claim, rather than the failure to present any specific supporting evidence, which has resulted in the failure of proof."

23

consistent and leads me to believe that she is most likely telling me the truth."

Ms. Obianuju's testimony is also consistent with the State Department's country reports and Amnesty International reports about Cameroon. Indeed, the INS concedes that human rights violations are prevalent in Cameroon. The U.S. Department of State 1998 Profile of Asylum Claims and Country Conditions reports:

> [T]he government's human rights record continues to be generally poor and government officials continue to commit numerous abuses. . . . Security forces have committed extrajudicial killings and often beat and otherwise abused detainees and prisoners, generally with impunity. Conditions in most prisons remain life-threatening. Security forces have arrested and detained opposition politicians, local human rights activists and ordinary citizens, often holding them for prolonged periods and, occasionally, incommunicado.

The 1999 Country Report on Cameroon, also prepared by the State Department, provides a more detailed description of these abuses, including "security forces subject prisoners and detainees to degrading treatment that includes stripping, confinement in severely overcrowded cells, and denial of access to toilets or other sanitation facilities."13 It also explains that a form "of physical abuse commonly reported to be inflicted on detainees include the'bastinade,' in which the victim is beaten on the soles of the feet."

Dr. Milton Krieger's description of the conditions is likewise consistent with Ms. Obianuju's version of events. In his first affidavit, admitted into evidence by the IJ, he addresses in some detail the imprisonment of SDF and SCNC members after the alleged attacks on government buildings in March and April of 1997. He specifically noted his knowledge of 42 SCNC and SDF members who were

_____

13. Also attached to Ms. Obianuju's asylum application were country reports for 1996, 1997, and 1998. Each of these reports, like the 1999 report, provides specific instances of conflicts between the security forces and Cameroonians, as well as extrajudicial killings. Each provides a similar portrayal of conditions in Cameroon.

sentenced to up to life in prison by a military court for their alleged involvement in the attacks. He also explained that "SDF rank and file members are often caught in security sweeps during 'crisis' times such as the alleged attacks on government buildings in March and April 1997, and these rank and file members are frequently subject to human rights abuses perpetrated by the government."

The five pieces of evidence that the BIA concluded were fraudulent based solely on the Susser letter can now be properly considered. First, the medical certificate confirms that Ms. Obianuju underwent an emergency appendectomy because her appendix was ruptured. Second, in his affidavit, Glory's father, Isaiah Ezeagwuna, tells about the security police's continual harassment of his family in an effort to locate Ms. Obianuju. Third, Robert Nsoh Fon's affidavit describes the other evidence submitted, including the warrant, bail bond, and SDF and SCNC membership cards. Fourth, the warrant provides that Ms. Obianuju is to be arrested because she jumped bail. Fifth, the bail application provides that 1,500,000 francs were paid for her release from jail in April 1997.

In Fon's March 10, 1999 affidavit, which was not a subject of the investigation described in the Susser letter, he confirmed Ms. Obianuju's version of events. He explained that she was known to be "amongst those who were strong student supports [sic] of the SDF political party." He concluded that if she returned to Cameroon she would certainly be at risk of further persecution, and very possibly death.

We also have an affidavit from Ngu George Moma. He confirms that he hid Ms. Obianuju in his home when her parents discovered that security forces were seeking to arrest her again. He also explained that he obtained a visa for her in the name of Francisca Moma. And finally, he explained that he took such drastic measures to protect her and to get her out of Cameroon because he believed that she faced an imminent threat of persecution, and noted that such a threat continued to exist.

The only evidence casting any doubt on Ms. Obinanuju's claims that she was persecuted is the alleged fraudulent

SDF card she submitted. The FDL report explained that the card dated 1991 did not match the cards they had on file for that year and that the card dated 1998 appeared to be

genuine. However, as the BIA acknowledged, Ms. Obianuju had volunteered an explanation, even before the FDL completed its examination of the cards, that the 1991 card was actually issued in 1996 when she joined the SDF and only bears the 1991 date because she paid dues for the previous years. She provided affidavits of SDF members from Cameroon who confirmed that backdating cards to reflect this was common practice, and expressed their own belief that the cards were genuine.14 However, the BIA rejected the proffered explanation: "it seems unlikely that SDF records would not list the respondent as a contributor in 1996 when she became an official member yet would show retroactive contributions to 1991." The BIA stated no basis for its view, that this custom appears unlikely, and it seems to be no more than its belief that the same result could have been accomplished by a different means. Furthermore, the same FDL report says that the 1998 card does conform to the samples for that year. This ambiguity regarding the SDF cards is certainly not enough to overcome the significant evidence provided by Ms. Obianuju and her powerful and credible evidence.

We therefore find that a reasonable factfinder would be compelled to conclude that Ms. Obianuju was persecuted because of her political opinion. This showing of past persecution gives rise to a presumption that she will be persecuted if returned to Cameroon, and the INS has failed to rebut this presumption.

---

14. Januarius J. Asongu, a citizen of Cameroon and SDF member who was granted political asylum in the United States, examined Ms. Obianuju's membership cards. He explained:"Based on my experience as a long-time SDF member and as Secretary of the Texas SDF, I have determined that the cards appear to be genuine." He also explained that it was common practice for members to pay dues for previous years. Another Cameroonian and SDF member, Kenneth Numfor Ngwa, also reviewed the cards and said they"are entirely consistent with every SDF card that I have seen, and I believe that the cards are genuine." He also explained that he knew several people whose cards were dated years earlier because they had paid the previous years' dues upon joining.

26

III.

In conclusion, we hold that Ms. Obianuju is eligible for asylum because of past persecution on account of her political opinion, and that she also is entitled to withholding of deportation.

Accordingly, we will GRANT the petition for review, REVERSE the order of the BIA dismissing petitioner's appeal, and REMAND this case to the BIA with instructions to grant Ms. Obianuju's application for withholding of deportation and to present this matter to the Attorney General for the exercise of his discretion as to asylum under S 1158(b) consistent with this opinion.

Appendix
Susser Letter

Bureau of Democracy,
Human Rights and Labor
August 7, 2000

NAME: Obianuju, Glory
A #: 76 142 746
COUNTRY: Cameroon

Irene Feldman
Assistant District Counsel
U.S. Department of Justice
Immigration and Naturalization Service
Elizabeth, NJ 07201

Dear Ms. Feldman:

I am writing to forward the results of an investigation, by a Foreign Service post, of documents presented in support of the asylum application of the above-named individual. These documents were forwarded to us by your office.

Regarding the Medico Legal Certificate, the Director of Administrative affairs in the Provincial Hospital of Bamenda stated that the round form and the stamp used for the Certificate are fake, and that there is no medical record at the hospital for Glory Obianuju. He also noted that no doctor by the name of James N. Chefor has ever worked at the hospital. The investigator in the U.S. Embassy in Yaounde, Cameroon, concluded that this document is fraudulent.

Regarding the affidavits dated October 22 and November 15, 1999, the president of the High Court of Bamenda stated that the round stamp and the Commissioner for Oaths stamps are fake. He further stated that neither affidavit had been registered or sworn in the High Court of Bamenda. It is the Embassy investigator's conclusion that this document is fraudulent.

It is the Embassy investigator's conclusion that arrest warrant and application for bail documents are also fraudulent. The arrest warrant lacks key information such as the charge number and dates of appearance and time.

The application for bail was allegedly signed by an individual who has never served as president of the court.

We hope that this information is helpful. If we can be of any further assistance. Please do not hesitate to contact us.

Sincerely,

Marc J. Susser
Director
Office of Country Reports and
Asylum Affairs

A True Copy:
Teste:

Clerk of the United States Court of Appeals
for the Third Circuit

29